Jennifer COOK, Plaintiff,

v.

GREYHOUND LINES, INC., a Delaware
Corporation, Defendant.

Civ. No. 5–91–153.

United States District Court,
D. Minnesota,
Fifth Division.

Feb. 24, 1994.

Mark R. Kosieradzki and Wilbur W. Fluegel, Sieben, Grose, Von Holtum, McCoy & Carey, and John T. Chapman, Arthur, Chapman, McDonough, Kettering & Smetak, Minneapolis, MN, and John R. O'Brien, Jardine, Logan & O'Brien, St. Paul, MN, for Defendant.

## ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

Before the Court are the following four Motions of the parties:

1. The Defendant's Motion for Leave to Amend its Answer;

2. The Defendant's Motion *in limine* to Exclude Evidence of Criminal Records;

3. The Defendant's Motion to Compel Answers to Interrogatories; and,

4. The Plaintiff's Motion for Leave to Amend her Complaint.

At the Hearing on these Motions, the Plaintiff appeared by Mark R. Kosieradzki and Wilbur W. Fluegel, Esqs., and the Defendant appeared by John T. Chapman and John R. O'Brien, Esqs.

For reasons which follow, the Defendant's Motion for leave to amend its Answer and the Plaintiff's Motion to amend her Complaint are granted; the Defendant's Motion to exclude certain criminal records is denied, as is the Defendant's Motion to compel answers to certain of its Interrogatories.

1. In summarizing the pertinent facts, we have drawn heavily upon the depositions of the Plaintiff and of an eyewitness to the events of June 27, 1990, Ms. Tyonne Bud Eagle Feather. We wish to make clear, however, that our recitation of the factual background, does no more than recite those facts which we regard as germane to the

### II. *Factual and Procedural Background* [1]

The Plaintiff alleges that, on June 27, 1990, she was verbally, physically and sexually assaulted while she was a passenger on a bus that was owned and operated by the Defendant. At the time of the assault, the Plaintiff was en route from Washington, D.C., to Pittsburgh, Pennsylvania, on her return trip home to Minnesota, following a visit with her brother in Fort Eustis, Virginia.

Prior to departing from the bus terminal in Washington, an individual, who has since been identified as Timothy Lamont Walker ("Walker"), boarded the bus and occupied the seat next to the Plaintiff. Ms. Tyonne Bud Eagle Feather ("Eagle Feather"), who was an eyewitness to the events of June 27, has characterized Walker as appearing obviously intoxicated and as looking "like he had been around a while, * * * like he was real street wise, like he lived it rough, city tough and wasn't going to try to hide it."

Shortly after the bus departed, Walker commenced drinking from a bottle of liquor which he had been passing around. According to Eagle Feather, when the bottle was empty, Walker began shouting to the driver to pull the bus over in order that he could retrieve some liquor which was in the baggage compartment. In response to these urgings, the driver told Walker and some other passengers to wait until the bus reached an approaching town, where a liquor store was located, at which they could stop and purchase beer.

In Eagle Feather's view, the driver must have been aware of the drinking that was occurring at the back of the bus. In fact, according to Eagle Feather and the Plaintiff, within a short time thereafter the bus did stop. As Eagle Feather described this occurrence:

I was getting real nervous thinking to myself, "This can't be." * * * I did not think [the driver] would actually stop for

Motions before us, but without any implication, express or implied, as to their ultimate accuracy, or as to their probative weight. Although we are advised that the deposition of the bus driver, Raymon Carter, has also been taken, a copy of that deposition transcript has not been submitted for our review.

them to get alcoholic beverages. We got to that town, and I was getting very nervous. The Greyhound station was not lit up. Even the parking lot lights were not lit. * * * No one got off; no one got on. [The driver] did not get off to drop off any packages. No one came out with any packages. He parked and gave directions to the liquor store and waited.

Walker and another passenger gathered money from some of the other passengers, left briefly, and returned with a case or two of bottled beer. On at least two occasions during this segment of the trip, Eagle Feather observed as Walker brought open bottles of beer to the driver. She did not see the driver consume those beers, however.

What then ensued was described by the Plaintiff as follows:

[T]hey started passing the beers around, and some guys from the front, some white guys from way up front, came back and bought some and went back to their seats. It was just really loud. There was [sic] bottles rolling, and [Walker] started pestering me about having a beer. I didn't want it, and I kept telling him I didn't want it. And finally I just took it so maybe I thought he would leave me alone, you know, because he kept pestering me, you know.

That didn't work. He just kept pestering, and everybody was drinking and smoking.

By Eagle Feather's account, Walker was more insistent than the Plaintiff had recalled. As Eagle Feather recounted, she saw Walker forcibly place a bottle of beer to the Plaintiff's mouth, and then position the bottle so that the beer "would guzzle into her mouth." It was also Eagle Feather's recollection that, before Walker's bottle of liquor had been emptied, he had secretly poured some of its contents into a container of pop that the Plaintiff had brought with her. According to Eagle Feather, at one point the Plaintiff "grabbed her pop and began drinking * * * through the straw and made kind of a funny face like there is something wrong here." Later, when Walker attempted to take the pop from her, the Plaintiff "guzzled the whole thing down and made a very funny face while doing so."

Eagle Feather observed that, shortly after finishing her pop, the Plaintiff began to look intoxicated, as she was "slumping" in her seat. As the beer ran out, things quieted, and the passengers began to fall asleep. At some point thereafter, the Plaintiff rose to use the rest room. As she explained, Walker approached the rest room right behind her. He pushed her inside, followed her in, and locked the door. Once inside, Walker forced the Plaintiff onto the toilet, where he tried to engage her in oral sex. When the Plaintiff did not cooperate, Walker is reported to have grabbed her by her neck and arms and hauled her back to their seats, where he continued his assault. As she resisted his attack, Walker is said to have become angrier, dragging the Plaintiff back into the rest room.

Eagle Feather recalls that she was awakened when the Plaintiff bumped into her, as she was being drawn back into the rest room. According to Eagle Feather, the Plaintiff's "eyes were not even halfway open," and she appeared to be unable to stand on her own. Eagle Feather heard the Plaintiff mumble, "No, let me sleep. * * * Let me go." Again, on this second occasion, Walker locked the Plaintiff in the rest room and attempted to force her to perform oral sex upon him. But, according to Eagle Feather's account, the Plaintiff came bursting out of the rest room, clothes disheveled and crying. Walker's appearance was also one of disarray. As Eagle Feather explained:

He was grabbing her by the arm, trying to pull her back into the bathroom. * * * And she was getting loud, [saying] "No. Just leave me alone. Just leave me alone. Let me go back to my seat" * * *.

Eagle Feather concluded that the Plaintiff had expressed these statements in a voice that "the driver definitely would have heard." Indeed, Eagle Feather recalled seeing the driver look up when the Plaintiff had informed Walker to leave her alone. As Eagle Feather recounted, when "Walker saw the driver looking up, he stopped pulling [the Plaintiff] and put his hand over her mouth. * * * And he let her get back into the seat."

When she exited the rest room, the Plaintiff recalls that she was looking around and "screaming and kind of pleading with everybody, and people just sat there like zombies." Eagle Feather's testimony was similar:

> [S]he was looking around very panicked and looking in this pleading expression, like somebody help me. Everybody was either asleep or ignoring her.

In fact, Eagle Feather chose to do nothing to help the Plaintiff because she was traveling with her infant daughter and did not know how Walker and the others would have reacted if she tried to assist. Moreover, she testified, since the driver had openly allowed the beer drinking, she did not believe that he would have come to the Plaintiff's assistance if a complaint would have been made. As Eagle Feather explained, very simply, she was scared.

Upon returning to her seat, Walker continued in his effort to persuade her to return with him to the rest room. Eagle Feather recalls that Walker grabbed the Plaintiff by the hair and again forced her to consume some beer. As the Plaintiff continued to resist, Walker finally ceased his demands and, instead, he lifted the Plaintiff out of her seat, forced her onto his lap and, according to the Plaintiff and Eagle Feather, he raped her. In Eagle Feather's words:

> [The Plaintiff's] facial expression was absolutely emotionless. She was dead. * * * Her eyes were watering up, and she kind of half looked around, and that's how I saw her eyes. She kind of looked around, and, like, "Isn't anyone going to stop this?" When she saw everybody was either ignoring her or sleeping, she just kind of hung her head down, and she looked pathetic.

As the bus neared the Pittsburgh station, Walker quit his assault, and he was one of the first passengers off the bus upon arrival at the station. In the words of the Plaintiff:

> And he just ran off the bus, and I don't know what I did. I was really screwed up. I was just sitting there trying to pull myself together after having—you know, all the people were watching and nobody did anything.

> I'm pretty sure the bus driver could see what was happening because I was making noise. There was a lot of noise going on in the back.

Nevertheless, when the Plaintiff was directly questioned on the subject of the driver's knowledge, the following colloquy occurred:

Q. How do you know that the bus driver could hear you?

A. I just—I don't know for sure. I assume.

Q. Did you ever talk—you never talked to the bus driver at all about this?

A. No, I figured that he was—I figured he knew the other guys on the bus because Walker told me that he was a drug dealer, and he knew this bus driver, and he carried drugs from DC to Pittsburgh underneath.

Q. Who carried drugs, Walker?

A. Yes, and the bus driver knew it, and that's what Walker told me, so I didn't know what to believe. He told me a bunch of crap.

Q. Did you have any reason to believe that the bus driver knew Walker?

A. No.

As a result of these events, the Plaintiff commenced this action against the Defendant, asserting that, as a common carrier, the Defendant was vicariously responsible for the acts of the driver. By her pending Motion, the Plaintiff seeks to amend her Complaint so as to allege a direct action against the Defendant for the negligent hiring, retention and supervision of the bus driver.

In answering the Plaintiff's Complaint, the Defendant generally denied that it was negligent and alleged its sole affirmative defense in the following terms:

> Alleges that the plaintiff's injuries and damages were caused by the negligence or other actionable conduct of other persons, over whom defendant had no control or right of control, and for whom it is not responsible.

By its pending Motion to amend its Answer, the Defendant seeks leave to plead the following affirmative defenses:

> 1. That the Plaintiff was not raped nor subjected to other criminal sexual conduct;

2. That, if sexual conduct did occur, the Plaintiff consented to it;

3. That any injuries or damages sustained by Plaintiff were the result of risks voluntarily and knowingly assumed by her, and that her damages were the result of her own intervening and superseding conduct; and,

4. That the Plaintiff's "contributory negligence" was the cause of her injuries, and that her own fault was equal to or greater than any fault of the Defendant.

The Plaintiff has opposed the Defendant's Motion to Amend, arguing that the proposed affirmative defenses are factually unsupported and legally without merit.

In addition to the foregoing, discovery in this matter has produced two points of discord: 1) a dispute over the admissibility of the criminal records of Raymon Carter ("Carter"), who was the driver of the bus on which the events of June 27 occurred; and, 2) a conflict over the discoverability of the individual who, the Defendant contends, has been accused by the Plaintiff of perpetrating a "date rape" against her. By a Motion *in limine,* the Defendant seeks the exclusion of the criminal records as unfairly prejudicial and, by a Motion to Compel, the Defendant seeks the disclosure the "date" rapist.

Insofar as the criminal history of Carter is concerned, the record reflects that he was hired by the Defendant less than 90 days before the date of the alleged assault, and that, at the time of his hire, he was a convicted felon. In 1984, Carter was convicted for theft; in 1985, for possession of heroin; and in January and November of 1990, for check forgery. Additionally, Carter was charged with theft in 1987, with auto theft in 1989 and, in 1990, he was the subject of a Bench Warrant for failing to comply with the conditions of an alternative release program. In the Plaintiff's view, this criminal history is germane to her proposed claim of negligent hiring, retention and supervision, and it is also admissible, she argues, based upon Rule 609, Federal Rules of Evidence, which governs the impeachment of a witness through evidence of a criminal conviction.

As to the "date rape" incident, the Defendant uncovered, in the clinical notations of the Plaintiff's therapist, the following comment: "'Jennifer was date-raped at Mankato State—'that was nothing compared to the thing on the bus.'" At her deposition of April 1, 1991, the Plaintiff was questioned on the circumstances of the "date rape" as follows:

Q. Apparently, Ms. [Cook], there is a reference in the medical records to a date rape. Do you know what that refers to?

A. Yes. I don't know if it was a rape. It was on a date. I just got too involved.

Q. So—

A. I was confused. I don't know what to call that.

Q. Okay. But so you really can't say whether or not that was a sexual assault or not?

A. Huh-uh, no.

Q. Okay.

A. He was my boyfriend.

  *  *  *  *  *  *

Q. Okay. Did you suffer any consequences from that incident, do you feel?

A. No.

Q. Emotional problems as a result of that incident?

A. I was just confused.

Following this exchange, in June of 1993, the Defendant served a supplemental Interrogatory which requested the identity of the Plaintiff's former boyfriend who had been involved in the alleged "date rape." The Plaintiff having declined to disclose that individual's identity, the Defendant seeks the divulgence of that information by the referenced Motion to Compel.[2]

### III. *Discussion*

A. *The Motions to Amend the Pleadings.*

1. *Standard of Review.* Where, as here, the parties have exchanged their initial round of pleadings, Rule 15(a), Federal Rules of Civil Procedure, describes the appropriate

---

**2.** We note that discovery in this matter will not be completed until April 1, 1994, and that the trial of this action will commence on May 2, 1994.

procedure for amending a pleading as follows:

> \* \* \* [A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. \* \* \*

In construing this Rule, the Supreme Court has observed:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); see also, *Thompson–El v. Jones*, 876 F.2d 66, 67 (8th Cir.1989).

■ In considering the propriety of an amendment to a pleading, the policy of the Federal Courts, as exhorted by the Federal Rules, is to "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits," and to avoid an approach which would relegate the process to "a game of skill in which one misstep by counsel [might] be decisive to the outcome." *Foman v. Davis*, supra, 371 U.S. at 181–82, 83 S.Ct. at 229–30, quoting *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

■ Nevertheless, the right to amend the pleadings is not absolute. *Thompson–El v. Jones*, supra, at 67. "When a considerable amount of time has passed since the filing of a complaint and the motion to amend is made on the eve of trial and will cause prejudice and further delay, courts require the movant to provide some valid reason for the belatedness of the motion." *Id.*, citing *Mills v. Des Arc Convalescent Home*, 872 F.2d 823, 825–26 (8th Cir.1989).

■ Where, as here, a party opposes an amendment on the grounds of futility, the standard applied is the same as that invoked in a Motion to Dismiss. See *Humphreys v. Roche Biomedical Laboratories Inc.*, 990 F.2d 1078, 1082 (8th Cir.1993); *Weimer v. Amen*, 870 F.2d 1400, 1407 (8th Cir.1989); *Holloway v. Dobbs*, 715 F.2d 390, 392–93 (8th Cir.1983); *Jeffers v. Convoy Co.*, 650 F.Supp. 315, 317 (D.Minn.1986); *Collyard v. Washington Capitals*, 477 F.Supp. 1247, 1249 (D.Minn.1979); but cf., *Karl's Inc. v. Sunrise Computers, Inc.*, 901 F.2d 657, 660 (8th Cir. 1990) ("colorable showing" sufficient to withstand application of clearly frivolous rule); *Medtronic, Inc. v. Catalyst Research Corp.*, 518 F.Supp. 946, 955 (D.Minn.1981), aff'd. on other grounds, 664 F.2d 660 (8th Cir.1981) (applies undefined "clearly frivolous standard" in distinction to standard normally applied to a motion to dismiss).

■ In the final analysis, the granting of a Motion to amend the pleadings is vested in the sound discretion of the Trial Court. *Ryan v. Sargent*, 969 F.2d 638, 641 (8th Cir.1992), cert. denied, — U.S. ——, 113 S.Ct. 1000, 122 L.Ed.2d 150 (1993); *Thompson–El v. Jones*, supra at 67, citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971).

2. *Legal Analysis.* Neither party has consented to the amendment of the pleading that the other has proposed. We, therefore, examine each of the proposals in turn.

a) *The Plaintiff's Motion to Amend her Complaint.*

The Plaintiff seeks to amend her Complaint in order to allege that the Defendant had negligently hired, supervised and retained the driver of the bus on which the events of June 27, 1990, had occurred. If allowed, the amendment would permit a direct negligence action against the Defendant to supplement the vicarious causes of action which she had earlier pled and which are based upon the principles of *respondeat superior*.

1. *Standard of Review.* By way of historical background, the theory of negligent

hiring was first recognized by the Minnesota Supreme Court in *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907 (Minn.1983). In *Ponticas*, a tenant was raped by the manager of the apartment complex in which she lived. In bringing her action against the owner and operator of the apartment complex, the Plaintiff asserted that the Defendants were negligent in hiring the individual who had committed the offense because of that individual's criminal history. Judgment was rendered for the Plaintiff and, upon an appeal, the Supreme Court sustained that Judgment by recognizing the duty of an employer "to exercise reasonable care in view of all the circumstances in hiring individuals who, because of the employment, [might] pose a threat of injury to members of the public." *Id.* at 911 and n. 5. The Court explained:

> Liability is predicated on the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others. *Id.*

In finding a basis for recovery, the Court relied upon the Restatement (Second) Agency § 213 (1958) which stated:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> \*    \*    \*    \*    \*    \*
>
> (b) in the employment of improper person or instrumentalities in work involving risk of harm to others.

Notably, the predicate tortious act in *Ponticas* was an intentional tort that, necessarily, excluded the conduct from the "course and scope of employment requirement" which underlies the *respondeat superior* doctrine.

■ Different than, but closely related to the doctrine of negligent hiring, is that of negligent retention. As noted, negligent hiring is premised upon an employer's negligence in failing to investigate an employee's background before the employee is hired, while negligent retention "occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that reflected his unfitness, and yet, the employer fails to take further action such as investigation, discharge, or reassignment \* \* \*." *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 423 (Minn. App.1993), rev. denied (Minn. April 20, 1993), quoting *Garcia v. Duffy*, 492 So.2d 435, 438–39 (Fla.Dist.Ct.App.1986); see also *Porter v. Grennan Bakeries, Inc.*, 219 Minn. 14, 16 N.W.2d 906 (1944); *Travelers Indem. Co. v. Fawkes*, 120 Minn. 353, 139 N.W. 703 (1913); *Kresko v. Rulli*, 432 N.W.2d 764, 769 (Minn. App.1988), rev. denied (Minn. Jan. 31, 1989). As is the circumstance with a claim of negligent hiring, recovery for negligent retention is also premised upon an employee's conduct which occurred outside of the scope of his or her employment. *Yunker v. Honeywell, Inc.*, supra.

■ A third, and distinguishable, theory of recovery—that of negligent supervision—requires an employer to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to other employees or third persons. Of this triad of potential recoveries, only negligent supervision derives from the *respondeat superior* doctrine. See *Ponticas v. K.M.S. Investments*, supra at 910; *Yunker v. Honeywell, Inc.*, supra at 422; *Raleigh v. Independent School Dist. No. 625*, 275 N.W.2d 572, 576 (Minn.1978). Accordingly, under the rubric of negligent supervision, in order to successfully state a claim against an employer, the claimant must establish that the employee who caused an injury did so within the scope of his or her employment.

2. *Legal Analysis.* In opposing this Motion to Amend, the Defendant argues that a cause of action based upon negligent hiring and retention is unavailing under the facts of this case. In particular, the Defendant relies upon the Minnesota Court of Appeals' decision in *Yunker v. Honeywell, Inc.*, supra. There, a wrongful death action was commenced against Honeywell after an employee shot and killed a co-worker in the driveway of the co-worker's home. The employee who committed the crime had previously worked

for Honeywell, and had been rehired after he had completed a 5–year prison sentence for the strangulation death of a different co-employee of Honeywell.

In explaining the prerequisites of an action for negligent hiring or retention, the Court stated:

> The remaining theories, negligent hiring and retention, are based on direct, not vicarious, liability.  * * * Negligent hiring and negligent retention do not rely on the scope of employment but address risks created by exposing members of the public to a potentially dangerous individual. * * * These theories of recovery impose liability for an employee's *intentional tort*, an action almost invariably outside the scope of employment, when the employer knew or should have known that the employee was violent or aggressive and might engage in injurious conduct.

*Id.* at 422 [Citations omitted and emphasis added].

The *Yunker* Court concluded that, under a theory of negligent hire, Honeywell was not liable for the death of the co-worker, because the job responsibilities of the employee of Honeywell, who had committed the crime, "entailed no exposure to the general public and required only limited contact with coemployees." *Id.* at 423.  Since the specific nature of that employee's conduct did not create a foreseeable risk of harm, Honeywell was not liable for that conduct under a theory of negligent hire.

The Court also rejected a recovery based upon the theory of negligent supervision, "because the [employee] was neither on Honeywell's premises nor using Honeywell's chattels when he shot [the coworker]." *Id.* at 422.  Since the employee was wholly outside the scope of his employment at the time of his criminal act, the principles of *respondeat superior* foreclosed Honeywell's liability on that count.

The *Yunker* court did, however, reverse the Trial Court's award of Summary Judgment to Honeywell on the claim of negligent retention, citing evidence in the record that Honeywell had been on notice of several prior instances when the offending employee had harassed female employees.  The Court left open the question of whether Honeywell

had breached its duty—under a negligent retention theory—by its apparent failure to take action in response to the offending employee's prior behavior, and also left the proximate cause issue unresolved.  *Id.* at 424.

Given the holding in *Yunker*, the Defendant argues that the proposed claim of negligent hiring or retention must fail because the driver of its bus had not engaged in an intentional act, while the claims against the Defendant all sound in negligence.  As to the claim of negligent supervision, the Defendant contends that such an action is futile since a common carrier cannot be expected to assign supervisors to every bus, or other conveyance, in order to police the actions of its employees.  The Plaintiff has not submitted a Memorandum of Law on this issue but, in an Affidavit of Plaintiff's counsel, the suggestion is forcefully advanced that the incipient provocation for these proposed claims is the relevancy of the driver's criminal records that the Plaintiff has uncovered.

While we agree that the current status of Minnesota law does not recognize a claim for negligent hiring or retention that is premised solely upon an employee's negligent act, we do not see that as the crucial constraint which underlies the applicability of those theories of recovery.  Rather, after an exhaustive survey of the case law, in this jurisdiction and elsewhere, we have failed to uncover any decision in which the doctrine of negligent hiring or retention has been applied to conduct which arises *within* the course and scope of an employment relationship.  This lack of precedential authority is not surprising, given the fact that the *raison d'etre* for the negligent hiring and retention doctrines was the unavailability of a recovery for conduct which was unactionable under traditional principles of vicarious liability.  Consequently, while it is true that, in both *Ponticas* and *Yunker*, the preclusive impediment to a *respondeat superior* claim was the existence of an intentional tort, the doctrine, we feel, may not be entirely unavailing in the context of unintentional torts.  See, e.g., *Di Cosala v. Kay*, 91 N.J. 159, 450 A.2d 508, 516 (1982), cited on other grounds in *Yunker v. Honeywell, Inc.*, supra at 422.

██ We conclude, therefore, that it is highly improbable that the Plaintiff will be able to successfully sustain an action for negligent hiring or retention, since it is not disputed by either of the parties that the Defendant's bus driver was within the scope of his employment at all pertinent times. He may well have performed his job poorly, or in contradiction of the Defendant's policies, but his conduct was integrally embraced within his duties and responsibilities as an operator of the Defendant's bus. We decline, however, to preclude the assertion of this claim—even though its potential viability seems remote—as we are unable to conclude, on the record before us, that there are no facts or set of facts which would allow a recovery under either of these two doctrines. Since that is the standard by which we consider a Motion to Dismiss, the same standard is apt when considering a Motion to preclude the inception of a claim.[3] See, *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989); *Hishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* supra 355 U.S. at 45–46, 78 S.Ct. at 101–02 (1957).

Lastly, we would note that, in our view, the negligent supervision claim is implicitly subsumed in the Plaintiff's general allegations that the Defendant was negligent. We, therefore, see no prejudice to the clarification of an allegation which is presently in a pleading and which has an appreciable, supportive showing in the evidentiary record. Whether the facts should ultimately support such a claim is an issue which is properly left to another day.

Accordingly, the Plaintiff's Motion to amend her Complaint, in order to assert an action for negligent hiring, retention and supervision, is granted.

b) *The Defendant's Motion to Amend its Answer.*

The Defendant asserts that its proposed amendment is merely to clarify the affirmative defenses which were previously interposed. As we have noted, by its proposed Amended Answer, the Defendant seeks to allege that the Plaintiff was not subjected to criminal sexual conduct; that any sexual contact was consensual; that the Plaintiff's injuries, if any, resulted from her own assumption of risks or from an intervening, superseding cause; and, that the Plaintiff's own negligence was the cause of her injuries.

In support of this Motion, the Defendant has submitted the Affidavit of its counsel which avers that the perpetrator of the alleged assault has contended that the conduct in question was consensual, and that, "at no time did [the Plaintiff] refuse to engage in any sexual contact or sexual intercourse during the period of time when the bus was in route * * * to Pittsburgh, Pennsylvania."

██ In opposing these amendments, the Plaintiff maintains that there is no factual support for the amendments, and that the theories of assumption of the risk, contributory negligence, and comparative fault are not applicable, given the Plaintiff's allegations. We disagree for, although not expressly stated in the Defendant's Answer, the affirmative defenses that the Defendant seeks to allege are, in practical effect, the obverse of her claim for recovery. Irrespective of the allegations in the Defendant's current Answer, a Jury might well conclude that the Plaintiff is not entitled to a recovery because she voluntarily participated in whatever events occurred on the bus, or because she engaged in conduct which, under the applicable law, constituted an assumption of the risk[4] or warranted the employment of

---

3. Of course, our decision to permit the Complaint to be amended is without prejudice to whatever Motion for summary disposition that the Defendant believes the facts and law would warrant. We merely grant the Plaintiff leave, consistent with the prevailing view, to amend her Complaint and to discover as to a claim which is not wholly barred as a matter of law.

We would also note that a claim for negligent hiring and retention would add little to the Plain-

tiff's original cause of action. As we have determined elsewhere in this Opinion, the felony convictions of the driver are admissible even in the absence of the negligent hiring and retention claims and, what appears to have been the provoking force for the proposed amendment, has been satisfied by an ancillary resolution.

4. The Plaintiff expresses concern that the Defendant seeks to avert her claim by means of the doctrine of "primary" assumption of risk. As-

comparative fault principles.[5] We do not understand the Plaintiff to be asserting that she is entitled to Judgment as a matter of law and, accordingly, the amendments that the Defendant proposes merely express what has already been clearly implied. Accordingly, we see no prejudice, under the circumstances before us, that is generated by the amendments that the Defendant requests.

■■■ The Plaintiff further contends that, since the conduct which injured her was intentional, the Defendant's liability should not be tempered by the ameliorative effects of comparative fault. Although we agree that "fault should not be apportioned between an intentional tortfeasor and a merely negligent victim," that is not what we understand the Defendant to be proposing. *Florenzano v. Olson,* 387 N.W.2d 168, 172 (Minn.1986). Instead, we understand the Defendant to be arguing that, if it is at fault for any damage to the Plaintiff, the fault must be premised upon the principles of negligence, since the Plaintiff has not alleged, and has not proposed to allege, that the Defendant has committed an intentional tort. Under such circumstances, the Defendant's fault, if any, should be compared with the fault, if any, of the Plaintiff. See, e.g., *Klingbeil v. Truesdell,* 256 Minn. 360, 365–66, 98 N.W.2d 134 (1959). We are aware of no rule of law which would preclude the comparison of fault that the Defendant seeks, and the Plaintiff does not identify any such authority.

Accordingly, we will grant the Defendant leave to amend its Answer to allege the referenced affirmative defenses, but without prejudice to the Plaintiff's right to seek to strike or limit the scope of any such defense prior to trial.

sumption of the risk applies "only where the parties have voluntarily entered a relationship in which plaintiff assumes well known, incidental risks." *Wagner v. Obert Enterprises,* 396 N.W.2d 223, 226 (Minn.1986). On this record, we are unable to determine whether the focus of the Defendant's claim of assumed risk is primary or secondary, and we leave the resolution of that issue to the time of trial.

5. Without attempting to be exhaustive, there is evidence that the Plaintiff voluntarily participated—at least at certain times—in consuming alco-

B. *The Defendant's Motion in Limine to Exclude Criminal Records.*

■■■ 1. *Standard of Review.* Rule 404, Federal Rules of Evidence provides:

Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity on a particular occasion, except:

\*   \*   \*   \*   \*   \*

(3) Character of witness. Evidence of the character of a witness, as provided in rules 607, 608, and 609. *Id.*

As a consequence, except as provided in Rules 607, 608, and 609 or, when an individual's character is directly at issue, evidence of the character of that individual, or of crimes or other wrongs that have been committed by that individual, are not admissible for impeachment or to prove that the individual engaged in a specific type of conduct, or did so with a particular intent on a specific occasion. See, e.g., *Breeding v. Massey,* 378 F.2d 171, 181 (8th Cir.1967).

Rule 609(a), Federal Rules of Evidence provides as follows:

For the purpose of attacking the credibility of a witness,

(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and

(2) evidence that any witness has been convicted of a crime shall be admitted if it

hol on the bus, while in the company of one whose appearance forewarned others of his street-wise nature; an appearance that was corroborated when Walker advised the Plaintiff that he was a drug dealer. There is also evidence that the conduct occurred in a crowded bus, that the Plaintiff did not sound an alarm during the course of the conduct, nor did she report Walker's behavior on a contemporaneous basis. While we need not, and do not, decide the strength of such factual showings, there can be no serious contention that they do not properly raise Jury issues.

involved dishonesty or false statement, regardless of the punishment.

Premised upon this authority, the Plaintiff has expressed an interest in proffering the criminal history of the Defendant's bus driver in order to assist the Jury in assessing the driver's credibility.

2. *Legal Analysis.* The Defendant stresses that the prejudicial impact generated by the criminal records of Carter should be sufficient, in and of itself, to overcome any apparent relevance that information may shed on the factual and legal issues of this case. In contrast, the Plaintiff contends that Rule 609 expressly recognizes her right to permit a Jury to appraise Carter's testimony in the light of his past criminal history.

▮ Our resolution of this issue, we find, is somewhat bifurcated, as a result of the differing nature of the crimes for which Carter was convicted. As to his two convictions for check forgery, these are indisputably crimes which involve "falsity or deceit" and, under the mandatory directives of Rule 609(a)(2), they are clearly admissible to attack Carter's credibility. See, e.g., *Wagner v. Firestone Tire & Rubber Co.,* 890 F.2d 652, 656 n. 3 (3rd Cir.1989); *United States v. Byrd,* 771 F.2d 215, 219 (7th Cir.1985); *United States v. Field,* 625 F.2d 862, 871 (9th Cir.1980). Accordingly, the Defendant's Motion to exclude Carter's two convictions for check forgery is denied.

▮ As to Carter's other convictions, they may or may not involve "falsity or deceit," but that is not apparent in the record before us. These convictions, we are told, are felonies under the law that produced those convictions. In the Plaintiff's view, the fact that these were felony convictions is sufficient to deprive the Court of any discretion as to their admissibility. Citing and quoting from *Green v. Bock Laundry Machine,* 490 U.S. 504, 109 S.Ct. 1981, 104

L.Ed.2d 557 (1989), the Plaintiff maintains that "Federal Rule of Evidence 609(a)(1) requires a judge to permit impeachment of a civil witness with evidence of prior felony convictions regardless of ensuant unfair prejudice to the witness or the party offering the testimony." *Id.* at 521, 527, 109 S.Ct. at 1990, 1994. Although we agree that the holding in *Green* has been correctly cited, we would note that the language of Rule 609(a)(1), upon which the *Green* Court ruled, was amended in 1990 to produce a different result. See, *Notes of Advisory Committee on 1990 Amendment,* Rule 609(a)(1). As a consequence, whether such evidence is admissible for impeachment purposes depends upon a careful balancing, under Rule 403, Federal Rules of Evidence, in order to determine if the probative value of the evidence is "substantially outweighed" by its potential for "unfair prejudice." In view of the sparsity of the record before us, we defer a conclusive ruling on the admissibility of Carter's felony convictions until the time of trial, although it would appear to us—absent a substantial showing to the contrary—that the current state of this record weighs in favor of their admissibility.[6]

C. *The Defendant's Motion to Compel Answers to Interrogatories.*

By this Motion, the Defendant seeks the identity of the individual who, purportedly, committed a "date rape" upon the Plaintiff. The Plaintiff opposes the Motion by arguing that there is no showing that a date rape occurred and that, in reality, the discovery that the Defendant seeks is merely an effort to cause her personal humiliation.

▮ 1. *Standard of Review.* "Interrogatories may relate to any matters which can be inquired into under Rule 26(b), and the answers may be used to the extent permitted by the rules of evidence." *Rule 33(b), Federal Rules of Civil Procedure.* Notably, dis-

---

6. We note, without deciding, that such evidence may be relevant to a claim of negligent hiring or retention should that claim remain viable at the time of trial. Mere allegations of wrongdoing, however, which have not resulted in a criminal conviction would seem to be a fragile basis upon which to question a witness' credibility, or the propriety of an employer's hiring or retention of an individual who has been subjected to unfounded allegations. We note, with appreciation, the concern of the Minnesota Courts that, left unconstrained, the negligent hiring and retention doctrines could effectively preclude the employment of rehabilitated criminals; a result that the Minnesota Courts have refused to sanction.

covery by written Interrogatories is not solely limited to admissible evidence, but extends to any matters which are relevant to the subject matter of the underlying litigation. Moreover, Rule 26(b), Federal Rules of Civil Procedure, provides for the discovery of all relevant information not privileged, including "the identity and location of persons having knowledge of any discoverable matter."

█ A party submitting Interrogatories may move for an Order, pursuant to Rule 37(a), Federal Rules of Civil Procedure, compelling a complete response to an Interrogatory, to which an opposing party has objected. The Court's ruling upon such an objection is subject to an abuse of discretion standard of review. See *Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342 (8th Cir.1979); *Edgar v. Finley*, 312 F.2d 533 (8th Cir.1963).

█ 2. *Legal Analysis.* In ruling upon this Motion, we are not unmindful of the letter and spirit of Rule 412, Federal Rules of Evidence, which commends the use of close scrutiny in evaluating an attempt to develop and to introduce evidence of the prior sexual history of a complainant in actions involving sexual assault. The law of this Circuit firmly establishes that "evidence of the past sexual behavior of an alleged victim of [rape or assault] is not admissible." *Rule 412(a), Federal Rules of Evidence;* see also *United States v. Eagle Thunder*, 893 F.2d 950, 954 (8th Cir.1990); *United States v. Azure*, 845 F.2d 1503, 1505 (8th Cir.1988); *United States v. One Feather*, 702 F.2d 736, 739 (8th Cir.1983). The prohibition of this Rule encompasses a complainant's previously withdrawn charges of criminal sexual conduct. See *United States v. Provost*, 875 F.2d 172, 177–78 (8th Cir.1989), cert. denied 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989); *United States v. Cardinal*, 782 F.2d 34, 36 (6th Cir.1986), cert. denied 476 U.S. 1161, 106 S.Ct. 2282, 90 L.Ed.2d 724 (1986). While Rule 412 is subject to limited exceptions, the most germane for our purposes is the Rule's express application to criminal proceedings. No similar evidentiary prohibitions have been provided by Rule in the context of a civil proceeding.

█ Although we are appreciative that, by its explicit terms, Rule 412 applies only in criminal cases, the policies it embraces logically extend to actions involving sexual assault which are prosecuted in a civil forum. Indeed, in our view, the defendant in a criminal proceeding has a more pressing interest in the disclosure of the information being requested here, than any that has been advanced by this Defendant. See, *Ayala v. Tapia*, 1991 WL 241869 (D.D.C.1991). Accordingly, absent a clear showing that a description of the Plaintiff's past sexual encounters, if any, has any discernible and articulable relevance to the issues before us, such discovery should be denied.

█ In weighing the Defendant's asserted need for the information, we are initially struck by the absence of any evidence that a "date rape" occurred. The language which precipitated the Defendant's interest in this discovery was not that of the Plaintiff, but was a jotting of a therapist. Despite ample opportunity to question the Plaintiff as to whether she had characterized the incident as a "date rape," the opportunity was not exercised, and we are left with a therapist's characterization which is of doubtful relevance to any of the Plaintiff's claims. Moreover, in our view, whether the Plaintiff has ever considered herself to have been a victim of a sexual assault has a most tenuous connection to the issues of this case. On June 27, 1990, the Plaintiff was either assaulted or she consented to conduct which she now claims was non-consensual. Apart from any eyewitnesses, the only ones to know the consensual nature of the events of June 27, 1990, are the Plaintiff and Walker. Accordingly, we find that the impressions of a prior escort, which recount his perception of his relationship with the Plaintiff, whether abusive, overbearing or innocuous, are too attenuated to have a bearing upon the pertinent issues of this case. As a consequence, we see no relevancy to the requested discovery, nor do we foresee any genuine potential that such discovery will lead to relevant evidence. We, therefore, deny the Motion to Compel.

738

WHEREFORE, It is—

ORDERED:

1. That the Defendant's Motion to Amend the Answer [Docket No. 27] is GRANTED.

2. That the Defendant's Motion to Exclude Criminal Records [Docket No. 32] is DENIED.

3. That the Defendant's Motion to Compel [Docket No. 35] is DENIED.

4. That the Plaintiff's Motion to Amend her Complaint [Docket No. 37] is GRANTED.