**UNITED STATES of America, for the Use and Benefit of WESTERN STEEL ERECTORS, INC., a corporation, Plaintiff,**

v.

**WOERFEL CORPORATION, a corporation, and Fidelity and Deposit Company of Maryland, a corporation, Defendants.**

**Civ. No. 4606.**

United States District Court,
D. North Dakota,
Southeastern Division.

Feb. 14, 1972.

John D. Kelly, Wattam, Vogel, Vogel & Peterson, Fargo, N. D., for plaintiff.

Thomas C. Wold, Pancratz, Wold & Johnson, Fargo, N. D., for defendants.

## MEMORANDUM OF DECISION

BENSON, Chief Judge.

The cause of action in this case arose under 40 U.S.C. § 270a commonly known as the Miller Act, and 28 U.S.C. § 1352. The case was tried to the Court without a jury.

The parties agree that the defendant Woerfel Corporation, as contractor, on the 18th day of June, 1970, entered into Contract No. N62477–69–C–0095 with the United States of America for the construction of an Omega navigation station at LaMoure, North Dakota. Defendant Fidelity and Deposit Company of Maryland was surety on the payment bond required of the contractor.

The use plaintiff, Western Steel Erectors, Inc., hereinafter referred to as Plaintiff, has sued the defendants for the sum of $18,166.55, and the defendant Woerfel Corporation, hereinafter referred to as Defendant, has counter-claimed for the sum of $26,300.00.

The Court finds:

Plaintiff is engaged in the business of iron and steel construction, but declined Defendant's invitation to bid on the iron and steel portion of Defendant's Omega contract because it was not interested in contracting that work. Thereafter the parties entered into an agreement designated as a Purchase Order, pursuant to which Plaintiff furnished iron work personnel, including an iron work foreman to Defendant, and also furnished welding machines and cutting torches. Both parties agree that the agreement could have been terminated by either at any time.

The Purchase Order was dated August 6, 1970, and the personnel fur-

nished by Plaintiff reported to the Omega site at LaMoure, North Dakota, on or about that time. The iron workers worked under the direction of their own foreman. The foreman received work assignments from Defendant's job superintendent. It was the responsibility of the foreman to read the plans and shop drawings, identify the iron required for placement, and direct the iron workers. Plaintiff's iron work foreman prepared time slips covering the iron workers hours and the hours when Plaintiff's welding machines and cutting torches were used. These time slips were approved at the site by Defendant's job superintendent. The slips were then used by Plaintiff in the preparation of invoices submitted to Defendant. The worker's time was billed at the hourly rate provided in the Purchase Order. The Purchase Order provided that "all equipment and machines will be billed at the standard AGC rates". There is some dispute as to what was meant by standard AGC rates, but the welding machines were uniformly billed at an hourly rate of $2.75, and the cutting torches were uniformly billed at an hourly rate of $3.50. The invoices were submitted to Defendant's LaMoure office, where they were cross checked against records turned in by Defendant's job superintendent. The invoices were then forwarded to Defendant's Milwaukee, Wisconsin, office. Any discrepancies between Plaintiff's invoices and Defendant's records were resolved before the invoices were forwarded to the Milwaukee office.

Payment came from the Milwaukee office, usually about thirty days after the invoices were submitted. All invoices submitted through October 26, 1970, were paid. Thereafter, at the direction of Defendant's project manager, no invoices were paid. The last payment covering invoices through October 26, 1970, was received by Plaintiff on December 9, 1970. Plaintiff was not informed that payments were not going to be made on invoices submitted after October 26, 1970.

The paid invoices for workers and equipment furnished through October 26, 1970, totalled $41,286.30. The unpaid invoices covering the period from October 27, 1970, to December 15, 1970, totalled $18,166.55, the amount sued for herein. On December 15, 1970, Defendant shut down the project temporarily and terminated the agreement with Plaintiff. Plaintiff learned of the termination through a telephone call initiated by Plaintiff after January 1, 1971, inquiring if Plaintiff's men should return to work. Plaintiff was advised that work had been completed.

From the beginning of the construction work on the project, Defendant had difficulty getting its iron and steel work done. Because of the work, including overtime, available to iron workers at an ABM missile project in the State of North Dakota, iron workers were not readily available for work on the Omega project.

Certain iron work which had been done by Defendant's own employees prior to the time Plaintiff's employees came on the job had to be torn out and replaced. After Plaintiff's men were on the job, Defendant was dissatisfied with the competence of Plaintiff's foreman, and so advised Plaintiff. Plaintiff's men were dissatisfied because of the overtime situation and at one time in August, they engaged in a "slow down". Plaintiff was advised of the slow down, and its vice president worked out the problem by going to the job site and talking to the men. Later, as a result of Defendant's complaints, Plaintiff replaced its foreman. Plaintiff obtained its men from the union hall, and had to take the men available to it. At one time, Defendant resorted to doing clandestine steel work at night, and at another time Defendant's job superintendent worked out an incentive deal with two of Plaintiff's employees, without Plaintiff's knowledge. This was quickly terminated when the union learned of it. In late August or early September, Defendant had to have certain iron work

replaced that had been placed by Plaintiff's employees.

■ Either Plaintiff or Defendant could have removed Plaintiff's employees from the job site at any time. Defendant's reason for not doing so was because there were no replacements available and it felt the situation would improve. Defendant approved the time slips covering all the time Plaintiff's employees were on the job. Defendant does not dispute the accuracy of Plaintiff's invoices, but claims it has been damaged by failure of Plaintiff's employees to perform iron work in accordance with the plans and specifications of the prime contract and contends that Plaintiff should be back charged accordingly. Defendant did not at any time advise Plaintiff of its intention to stop payment on Plaintiff's invoices or its intention to assert back charges. Defendant asserts that inefficiency and incompetence of Plaintiff's employees resulted in project delay and increased costs, but is uncertain as to delays which may have been caused by other than Plaintiff's employees. The evidence is insufficient to determine the damages, if any, resulting to Defendant, or attributable to Plaintiff's employees, from Defendant's problems with the iron and steel portion of its Omega contract.

On the basis of the facts herein, the Court concludes that Plaintiff is entitled to judgment against Defendants for the sum of $18,166.55, and for the dismissal of Defendant Woerfel Corporation's counter-claim.

Defendant's contention that Plaintiff was obligated to install the iron and steel in accordance with the specifications of the prime contract, and that any failure in that regard would be a breach of the contract between Plaintiff and Defendant, and a basis for the damages asserted in the counter-claim, is not borne out by the evidence. It is clear that the type of contract envisioned by Defendant is specifically the type of contract which Plaintiff rejected.

■ Plaintiff's obligation under the Purchase Order Agreement did not extend beyond providing iron workers and unnamed equipment. Defendant had the right to expect the same degree of skill from Plaintiff's employees as it could expect from its own employees. Section 34–02–10 N.D.C.C. provides:

"Skill required by employee.—An employee is bound to use a reasonable degree of skill unless his employer has notice of his want of skill before employing him. The employee is bound always to use all the skill he possesses so far as the same is required for the service specified."

■ If an employee does not possess a requisite degree of skill, the remedy of the employer is to discharge the employee. See Section 34–03–05 N.D.C.C.

Section 34–02–16 N.D.C.C. provides:
"Liability of employee for culpable negligence—Liability of employer for services.—An employee who is guilty of a culpable degree of negligence is liable to his employer for the damage caused to the latter thereby. Unless the service is gratuitous, the employer is liable to the employee for the value of services properly rendered."

On a tort basis, Defendant could conceivably have a claim against the Plaintiff for damages to Defendant arising out of any culpable negligence on the part of Plaintiff's employees in the prosecution of the work. It does not appear that this culpable negligence statute has been interpreted by the Supreme Court of North Dakota. The statute appears to require something more than ordinary negligence or lack of skill. As applied to employer-employee relationships, this Court would hold that the statute contemplates an element of willfullness or recklessness.

■ Under the Purchase Order Agreement, any culpable negligence on the part of Plaintiff's employees would be imputed to Plaintiff. The deliberate slow down would constitute culpable negligence, but no evidence was offered to

measure the damages, if any, caused to Defendant by the slow down.

The decision of Defendant not to terminate the agreement when it was evident that Plaintiff's employees were not performing in a manner satisfactory to Defendant was a business judgment which it exercised and for which there is no relief provided.

Plaintiff's attorney will submit an appropriate judgment, with interest, at the North Dakota legal rate, from January 15, 1971, and for costs. Attorney's fees are not awarded.