1997 ND 205

Twila NELSON, Plaintiff and Appellant,

v.

Vince GILLETTE, individually,
Defendant,

and

Kidder County, a North Dakota Political
Subdivision, Defendant and
Appellee.

Civil No. 960371.

Supreme Court of North Dakota.

Nov. 6, 1997.

Rehearing Denied Dec. 2, 1997.

Keith L. Miller, Miller, Norman & Associates, Moorhead, for plaintiff and appellant.

Scott K. Porsborg (argued) and Daniel L. Hovland (on brief), Smith Bakke Hovland & Oppegard, Bismarck, for defendant and appellee.

MESCHKE, Justice.

[¶ 1] Twila Nelson appealed a summary judgment dismissing all her claims against Kidder County for her sexual abuse by Vince Gillette, who was a licensed social worker for the County. We affirm dismissal of the vicarious-liability claim, but we reverse and remand the negligent-supervision claim for trial.

[¶ 2] Beginning in 1975, members of the dysfunctional Nelson family, including Twila, born August 10, 1973, became clients of Kidder County Social Services. When Twila was age sixteen in February 1990, the Juvenile Court placed her temporary custody with the Kidder County Social Services as a deprived child, and the County put her in foster care. Twila was moderately developmentally-disabled, but had enrolled in the public school system and eventually received a special-education high-school diploma. The County assigned Gillette as Twila's social worker for case management and for counseling "to overcome emotional problems" while in foster care.

[¶ 3] During counseling sessions in his office, his car, Bismarck's Pioneer Park, and her mother's home, Twila claims she was sexually abused by Gillette, including oral sex and intercourse. Twila alleges Deborah Abbott, the Kidder County Social Services Director, knew of Twila's mental handicap, her past experiences with sexual abuse, and her psychological history of sexual promiscuity from Gillette's reports, and thus she should have been alerted to the potential for Twila's sexual exploitation. In her deposition, Abbott conceded she had read the reports and knew Twila's case history, but denied suspecting Gillette was sexually abusing Twila. Abbott testified it was not unusual for counseling sessions to take place in parks, and that she had known Gillette was transporting Twila "back and forth to Bismarck and Steele" to visit her mother: "She'd drop her suitcase off in the morning [at Gillette's office next to Abbott's] on the way to school."

[¶ 4] Twila's foster care ended on her eighteenth birthday in August 1991, when she left Kidder County and moved to Bismarck to live with her mother. Gillette continued contacts with Twila, often giving her rides between Bismarck and Steele to enable her to visit family. In late 1991 or early 1992, Twila told a friend about her relationship with Gillette. The allegations came to Abbott's attention near January 17, 1992. Abbott then instructed Gillette, for his own good, to stop giving Twila gratuitous rides.

[¶ 5] Abbott soon discussed the situation with Catherine Nelson, Twila's mother. Abbott then informed her supervisor, Rita Weisz of the West Central Human Service Center, and also notified the Bismarck Police Department who investigated. The police discovered evidence of sexual abuse, but Gil-

lette was never criminally prosecuted. In late 1993, the Board of Social Work Examiners revoked Gillette's license for his conduct with Twila.

[¶ 6] In 1994, Twila sued Gillette and Kidder County, alleging the County was vicariously liable for Gillette's abusive conduct within the scope of his employment, and alleging the County negligently hired and supervised him. In return for confession of judgment by Gillette for $250,000.00, Twila released him by agreeing to forego collection from him and instead to seek recovery from Kidder County.

[¶ 7] The County moved for summary judgment. In her response, Twila conceded the County was entitled to summary judgment on her negligent-hiring claim because there was no evidence of prior misconduct by Gillette, and the trial court granted summary judgment to the County on Twila's claims of negligent supervision and vicarious liability.

[¶ 8] In this appeal, Twila challenges the trial court's conclusions, as a matter of law, that there was no evidence to show the County negligently supervised Gillette, and that Gillette's abusive conduct was outside the scope of his employment. We affirm in part, reverse in part, and remand for trial on the negligent-supervision claim.

I

*Standard of Review*

[¶ 9] Summary judgment is a procedure for promptly disposing of a lawsuit without a trial. *Diegel v. City of West Fargo*, 546 N.W.2d 367, 370 (N.D.1996). Summary judgment is proper only if, after viewing all the evidence in a light most favorable to the non-moving party, no genuine dispute of material fact exists, and the only remaining question is one of law. *See* NDRCivP 56(c); *P.E. v. W.C.*, 552 N.W.2d 375, 380 (N.D. 1996); *Richmond v. Nodland*, 552 N.W.2d 586, 588 (N.D.1996). As we explained in *Opp v. Matzke*, 1997 ND 32, ¶ 6, 559 N.W.2d 837, after review of the evidence in the light most favorable to the non-moving party, we will not reverse a summary judgment unless we conclude a genuine dispute of material fact

exists, or the non-prevailing party is entitled to judgment as a matter of law.

II

*Vicarious Liability*

A.

[¶ 10] Nelson argues the County should be vicariously liable for Gillette's actions. Vicarious liability is often called imputed liability or "respondeat superior," the legalistic Latin phrase for "let the principal answer," a legal maxim that embodies the principle of vicarious liability. Bryan Garner, *Modern Legal Usage,* p. 764 (2d ed.1995). Respondeat superior is a longstanding doctrine in this state's jurisprudence. *Binstock v. Fort Yates Pub. Sch. Dist.,* 463 N.W.2d 837, 841–42 (N.D.1990) (citing *Rickbeil v. Grafton Deaconess Hosp.,* 74 N.D. 525, 23 N.W.2d 247, 260 (1946)). Respondeat superior and vicarious liability are the same concept. *See* 1 Modern Tort Law §§ 7.01 & 7.02 (Rev.Ed. 1994). As we explained in *Binstock* at 842, the doctrine means an employer is liable for tortious acts of its employees committed while they are acting within the scope of employment.

[¶ 11] On Twila's vicarious-liability claim, the trial court concluded Gillette acted outside the scope of his employment. Although the trial court understood the "alleged acts did occur during business hours and at business-related locations," the court believed Gillette's employment "was not such that sexual activity with clients is a likely result[,]" and saw no evidence "the purposes of Kidder County were being served by the alleged actions of Gillette, nor that Gillette thought he was serving the purposes of Kidder County in his alleged actions." (Footnote omitted). Because the court concluded Gillette's actions were outside the scope of his employment, the court held the County could not be vicariously liable, and granted summary judgment.

[¶ 12] Political subdivisions are vicariously liable for tortious actions of their public employees. *Binstock,* 463 N.W.2d at 842. In the aftermath of *Kitto v. Minot Park Dist.,* 224 N.W.2d 795 (N.D.1974)(abolishing governmental immunity of political subdivi-

sions), the legislature codified that vicarious liability:

> Each political subdivision is liable for money damages for injuries when the injuries are proximately caused by the negligence or wrongful act or omission of any employee acting within the scope of the employee's employment or office under circumstances where the employee would be personally liable to a claimant in accordance with the laws of this state. . . .

NDCC 32–12.1–03(1). In a general way, this statute makes the liability of political subdivisions the same as the liability of private citizens. *Fastow v. Burleigh County Water Resource Dist.*, 415 N.W.2d 505, 508 (N.D. 1987). Of course, absent a specific statute to the contrary, public employees acting within the scope of employment have long been individually liable for the injuries they cause, just like private employees have been liable for the same or similar acts. *E.g., Spielman v. State*, 91 N.W.2d 627, 630 (N.D.1958)(governmental immunity did not protect an employee of the government from liability for negligent acts). Thus, while political subdivisions' employees can be liable for torts in the scope of their employment, NDCC 32–12.1–03(1) confirms that the political subdivisions are vicariously liable for them, too.

### B.

[¶ 13] To grasp what conduct is within the "scope of employment" for vicarious liability, we must assess the meaning of that phrase. "Scope of employment" is not defined in NDCC ch. 32–12.1. The American Law Institute has restated the meaning assigned by case precedents generally:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> >
> > (b) it occurs substantially within the authorized time and space limits;
> >
> > (c) it is actuated, at least in part, by a purpose to serve the master, and
> >
> > (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency, § 228 (1958). Kidder County urges us to use the last fragment of this factored definition, which is sometimes called the "motivation-to-serve" test.

[¶ 14] The Restatement's "motivation-to-serve" test considers "[a]n act of a servant . . . not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." *Id.* at § 235. Under this theory, if the employee's actions do not properly further the employer's expectations, the employee's actions are not within the scope of the employment. The County cites numerous precedents from other jurisdictions that use this formulation. *E.g. Destefano v. Grabrian*, 763 P.2d 275, 286–87 (Colo. 1988); *Sharples v. State*, 71 Haw. 404, 793 P.2d 175, 177 (1990); *Medlin v. Bass*, 327 N.C. 587, 398 S.E.2d 460, 463 (1990); *Cosgrove v. Lawrence*, 214 N.J.Super. 670, 520 A.2d 844, 846–47 (1986); *Niece v. Elmview Group Home*, 131 Wash.2d 39, 929 P.2d 420, 428–29 (1997); *Block v. Gomez*, 201 Wis.2d 795, 549 N.W.2d 783, 788 (1996). *See also* Annotation, *Liability of Hospital or Clinic for Sexual Relationships with Patients by Staff Physicians, Psychologists, and Other Healers*, 45 A.L.R.4th 289 (1986). The County argues sexual conduct is "inherently motivated by the selfish, prurient interests of the perpetrator . . ." and so can never be within the scope of employment.

[¶ 15] Twila argues the Court should use a definition of "scope of employment" like the one given in *Marston v. Minneapolis Clinic of Psychiatry*, 329 N.W.2d 306 (Minn.1982). There, a psychologist had kissed and fondled patients during counseling sessions. The patients sued the clinic to establish its vicarious liability for the doctor's actions. The Minnesota Supreme Court analyzed the difference between an employee's negligent conduct and intentional acts. *Id.* at 309–10. The court recognized their previous rulings in *Lange v. National Biscuit Co.*, 297 Minn. 399, 211

N.W.2d 783 (1973), and *Edgewater Motels, Inc. v. Gatzke,* 277 N.W.2d 11 (Minn.1979), had used different formulations of "scope of employment" that needed clarification. *Marston,* 329 N.W.2d at 310. In *Lange,* an employee had intentionally assaulted another person during an argument. 211 N.W.2d at 784. The court had concluded "an employer is liable for an assault by his employee when the source of the attack is related to the duties of the employee and ... occur[s] within work-related limits of time and place...." *Id.* at 786. *Edgewater Motels* had dealt with an employee who negligently caused a fire at his place of employment. 277 N.W.2d at 13. Unlike in *Lange, id.* at 17 n. 6, the court in *Edgewater Motels* had cited the Restatement with approval and used the "motivation-to-serve" test.

[¶ 16] In its *Marston* opinion, the Minnesota Supreme Court clarified:

> ... For an intentional tort, the focus is on whether the [tort] arises out of a dispute occurring within the scope of employment. It is irrelevant whether the actual assault involves a motivation to serve the master. On the other hand, when the claim lies in negligence, the relevant duty of care is determined by employment status. Consequently, the requirement that the employee act, at least in part, in furtherance of his employer's interest requires both the existence of the duty and its exercise. Some confusion evidenced by this approach stems from the statement ... in *Lange* that "the employee originally was motivated to become argumentative *in furtherance of his employer's business.*" This statement, however, was intended merely to indicate that, even under the motivation test, the original precipitation event for the assault in *Lange* occurred in the scope of employment. It was not intended to preserve the motivation test for intentional torts.

*Marston,* 329 N.W.2d at 310 (citations omitted; emphasis original). The *Marston* trial court recognized the doctor's actions could not be classified as an assault, but nevertheless viewed the acts as intentional and applied the *Lange* rule. *Marston,* 329 N.W.2d at 311. The *Marston* Court held, *id.* at 310, the test of motivation to serve the master was irrelevant when applied to intentional acts.

[¶ 17] Other jurisdictions, those Twila cites, have given less weight to the motivation-to-serve test. *See Stropes v. Heritage House Childrens Ctr., Inc.,* 547 N.E.2d 244, 247–48 (Ind.1989); *Samuels v. Southern Baptist Hosp.,* 594 So.2d 571, 573 (La.Ct.App.1992); *Erickson v. Christenson,* 99 Or.App. 104, 781 P.2d 383, 386 (1989). In *Doe v. Samaritan Counseling Ctr.,* 791 P.2d 344 (Alaska 1990), a counselor coerced a patient into sexual activity. The Alaska Supreme Court cited the Restatement test, but held its motivation-to-serve element is satisfied when the "tortious conduct arises out of and is reasonably incidental to the employee's legitimate work activities...." *Id.* at 348. In doing so, the Alaska court recognized many jurisdictions applied the motivation-to-serve element as a threshold issue alone. *Id.* at 348–49. However, the Alaska court refused that kind of application since it would "significantly undercut" the overall concept of vicarious liability. *Id.* at 349. The court used all of the factors stated by Restatement § 228 to gauge the scope of employment and to conclude the counseling center could be found liable for the counselor's sexual conduct with a patient.

[¶ 18] This Court has not defined "scope of employment" for vicarious liability from an intentional tort by an employee. There is nothing in the legislative testimony or history of NDCC 32–12.1–03 and 32–12.1–04 that aids in defining it.[1] Therefore, we look to

---

1. Scope of employment is defined elsewhere in the North Dakota Century Code. Section 32–12.2–01(6), as amended by 1997 N.D. Laws ch. 286, § 1, says:

   "Scope of employment" means the state employee was acting on behalf of the state in performance of duties or tasks lawfully assigned to the employee by competent authority. Actions of a state employee that constitute reckless or grossly negligent conduct, malfeasance, or willful or wanton misconduct are not within the scope of the employee's employment for purposes of this chapter.

   This definition of "scope of employment," it appears, only applies to claims against the state under NDCC 32–12.2, *i.e.,* "[a]s used in this chapter ... 'Scope of employment' means...." However, the first sentence of ch. 32–12.2's defi-

related law and decisions for guidance. *See* NDCC 1–02–39(4) ("in determining the intention of the legislation ... consider among other matters: ... The common law or former statutory provisions, including laws upon the same or similar subjects.").

[¶ 19] In defining "scope of employment" for Workers' Compensation Act purposes in *Lippmann v. North Dakota Workmen's Comp. Bureau,* 79 N.D. 248, 55 N.W.2d 453, 458 (1952), we ruled the term "course of employment" there was "substantially equivalent" to the term "scope of employment" in the general law on master and servant. For that purpose, we defined "scope of employment" as an act that

> takes place within the period of the employment, at a place where the employee reasonably may be in the performance of his duties, and while he is fulfilling those duties or engaged in doing something incidental thereto, or as sometimes stated, where he is engaged in the furtherance of the employer's business.

*Lippmann* at 458. *See also Westman v. North Dakota Workers Comp. Bureau,* 459 N.W.2d 540 (N.D.1990). This *Lippmann* definition resembles the Restatement's formulation defining "scope of employment."

[¶ 20] Because "scope of employment" is not otherwise defined for political subdivisions' employees, we draw on the definition from *Lippmann,* the one articulated by the Alaska Supreme Court in *Doe,* and the one recommended by Restatement § 228. Like the Alaska Supreme Court, we conclude that all the elements of Restatement § 228 must be considered to assess whether an employee was acting within the scope of employment when committing an intentional act. [¶ 21] This test, we believe, more closely corresponds to the principal historical reason for the doctrine of imputed responsibility, that is "to give the victim an effective remedy when he is injured by a person who is likely to have small means." 57B Am.Jur.2d *Negligence,* § 1753 (1989). This test also corre-

lates with the modern basis for vicarious liability "that, as a matter of public policy, an enterprise or an activity should bear the risk of a tort—committed [by] those who, in fact, carry on the enterprise, activity or operation." *Id.* It seems counterintuitive to think that an employer, who is responsible for the negligent acts of an employee in performing the employee's duties, should not be similarly responsible for intentional acts of that employee.

[¶ 22] It would be legally unthinkable, for instance, to let a bank evade responsibility for a customer's money embezzled by an employee because the employee's intentional acts did not serve the employer's purposes. The custody of children is no less important than the custody of funds. Here, the County, after all, placed Gillette in the position that enabled him to abuse Twila. *See Marston,* 329 N.W.2d at 311 ("the instant situation would not have occurred but for [the] employment; it was only through his relation to plaintiffs as a therapist that [the employee] was able to commit the acts in question"). "The maxim of equity is: 'Where one of two innocent parties must suffer, he through whose agency the loss occurred must bear it.'" 57B Am.Jur.2d *Negligence* § 1754. *See also* NDCC 31–11–05(34). A victim's need for a remedy is no less when the tort is intentional and may well be greater. A judicial interpretation to constrict the definition of "scope of employment" could deny a remedy to the victim at the very moment it is most needed.

[¶ 23] Since Gillette's sexual exploitation of the claimant took place "during business hours and at business-related locations," disputed questions of fact may exist on whether Gillette's conduct met all the elements of the legal test of "scope of employment." *Marston,* 329 N.W.2d at 311. Ordinarily, therefore, we might reverse and remand for trial of those disputed facts. However, potential liability in this case is otherwise affected by an associated rule of vicarious liability that was not considered by the trial court.

nition corresponds to the one we use, and section 32–12.1–03(1) does not have the disclaimer in the second sentence of section 32–12.2–01(6). "Scope of employment" was formerly defined at NDCC 32–12.2–01(6) with reference to NDCC

26.1–21–10.1. However, NDCC 26.1–21–10.1 was repealed and the definition moved to NDCC 32–12.2–01(6) by the 1997 legislature. *See* 1997 N.D. Laws ch. 286.

## C.

[¶ 24] Despite the potential vicarious liability of Kidder County for Gillette's conduct, Twila released him from liability. Because the release of an employee is so closely related to the concept of vicarious liability, we need to analyze the effect of it in this case.

[¶ 25] We begin this analysis by considering part of NDCC 32–12.1–04(3):

*No employee may be held liable in the employee's personal capacity for acts or omissions of the employee occurring within the scope of the employee's employment unless the acts or omissions constitute reckless or grossly negligent conduct, or willful or wanton misconduct.* An employee may be personally liable for money damages for injuries when the injuries are proximately caused by the negligence, wrongful act, or omission of the employee acting outside the scope of the employee's employment or office. The plaintiff in such an action bears the burden of proof to show by clear and convincing evidence that the employee was either acting outside the scope of the employee's employment or office or the employee was acting within the scope of employment in a reckless, grossly negligent, willful, or wanton manner. . . .

(emphasis added). Construing this section in *Binstock,* 463 N.W.2d at 842, we concluded a political subdivision and its employee could be jointly liable if the employee injured someone while acting within the scope of employment in a reckless, grossly negligent, willful, or wanton manner.

[¶ 26] In general, when an employer is vicariously liable for an employee, the employer is entitled to indemnity from the employee because the employer "has only a derivative or vicarious liability for damage caused by the one sought to be charged." *Herman v. General Irrigation Co.,* 247 N.W.2d 472, 480 (N.D.1976). A master or employer, when held vicariously liable for a servant's or an employee's actions, can obtain indemnification from the servant or employee. *Id. See* NDCC 34–02–16 (employee who is guilty of culpable negligence is liable to employer for damage caused to employer);

*United States v. Woerfel Corp.,* 337 F.Supp. 895, 898 (D.N.D.1972) ("As applied to employer-employee relationships, . . . [NDCC 34–02–16] contemplates an element of willfullness or recklessness.").

[¶ 27] If Gillette's actions were reckless, grossly negligent, wanton, or willful, the County could be vicariously liable for Twila's injuries if his actions were within the scope of his employment. *Binstock,* 463 N.W.2d at 842. Gillette's behavior is best characterized as wanton. Willful and wanton actions are "[r]eckless, heedless, malicious; characterized by extreme recklessness or foolhardiness; recklessly disregardful of the rights or safety of others or of consequences." *Black's Law Dictionary* 1582 (6th ed.1990). Gillette used his position of authority and control over Twila for several years to extract sexual favors from her. His sexual activity with Twila was thus "wanton."

[¶ 28] However, in her settlement agreement, Twila released Gillette from liability. Under settled principles of vicarious liability, the County would be entitled to seek indemnification from Gillette for any damages Twila might prove, thus making Gillette's settlement release worthless.

[¶ 29] This very problem arose in *Horejsi v. Anderson,* 353 N.W.2d 316, 318 (N.D.1984), where an infant, through a guardian ad litem, sued his babysitter and his parents for injuries when the babysitter beat him. The parents hired the babysitter to care for their son. The babysitter settled with the infant claimant in an agreement that released the babysitter from further liability. The parents contended this release of the "servant" impliedly released any claims against them as the babysitter's "masters." We concluded in *Horejsi* that a release of the servant also released the master in order to avoid an insoluble "indemnity cycle." 353 N.W.2d at 320. If the parents were not dismissed, they would have been entitled to indemnification from the babysitter, despite the claimant's having released the babysitter from further liability.

[¶ 30] This identical problem arose again recently in *L.C. v. R.P.,* 1997 ND 96, 563 N.W.2d 799, a case that is even more to the

point with this one. In *L.C.*, a pastor and a church member, whom the pastor was counseling, had a sexual liaison for several years. The claimant contended the church Conference, as one of the pastor's employers, was vicariously liable for the pastor's improper actions. Her claim against the pastor was eventually settled, but she continued with her claim against the Conference. For L.C.'s vicarious-liability claim, 1997 ND 96, ¶ 8, we recognized, "[t]he same circle-of-indemnity concerns in *Horejsi* are present here. We conclude, as a matter of law, the parties' stipulation to dismiss [the plaintiff's] claims against [the employee] operated to release the [employer] from any claim of vicarious liability for [the employee's] acts."

[¶ 31] *Horejsi* and *L.C.* decided claims between private litigants, while here the "master" is a political subdivision, a creature of statute. *See Bigwood v. City of Wahpeton*, 1997 ND 124, ¶ 10, 565 N.W.2d 498. "A political subdivision shall indemnify and save harmless an employee for any claim, whether groundless or not, and final judgment for any act or omission occurring within the scope of employment or office of the employee...." NDCC 32–12.1–04(4). Still, while a political subdivision is thus required to indemnify its employees for negligence, it nevertheless may seek indemnification from an employee when it must pay for the employee's willful and wanton acts.

[¶ 32] The indemnification required by NDCC 32–12.1–04(4) was enacted to alleviate the high costs of liability insurance that political subdivisions were having trouble purchasing for their employees. *North Dakota House and Senate Committees on the Judiciary, 1977 Standing Committee Minutes of HB 1070 & HB 1071*, (January 19, 1977).[2] Before that legislation, the insurance obtained by a political subdivision would have covered the employee's negligent acts, but would not have protected the employee from liability for wanton and willful acts because

that protection would have been, and is yet, against public policy. NDCC 26.1–32–04 (insurer not liable for loss caused by willful act of the insured). *See Continental Cas. Co. v. Kinsey*, 499 N.W.2d 574, 580 (N.D.1993) (public policy bars indemnifying insured for loss caused by insured's own willful conduct); *Hins v. Heer*, 259 N.W.2d 38, 40 (N.D.1977) (same). *See also* NDCC 9–10–06 ("[e]veryone is responsible ... for the result of his willful acts....").

[¶ 33] Since the indemnification statute was meant to replace liability insurance for employees, we cannot construe it to require the County to indemnify Gillette for his wanton and willful acts. Not only would that subvert the legislative intent to substitute the political subdivision's indemnification of its employees in place of procuring liability insurance for them, but also such a construction would conflict with public policy.

[¶ 34] To construe NDCC 32–12.1–04(4) to make a political subdivision indemnify a public employee for wanton acts would conflict with NDCC 22–02–02 that declares "[a]n agreement to indemnify a person against an act thereafter to be done is void if the act is known by such person at the time of doing it to be unlawful." Gillette must have known his acts were unlawful, even if he was never prosecuted. *See* NDCC 12.1–20–07 (crime of sexual assault). As *BASF Corp. v. Symington*, 512 N.W.2d 692, 696 (N.D.1994), illustrates, rather than construing statutes to be in conflict, we interpret statutes to harmonize them.

[¶ 35] The County would thus be entitled to indemnity from Gillette if the County were found vicariously liable for his willful and wanton actions. This right of indemnification would make Gillette's settlement agreement worthless and would result in the corrosive circle of indemnity that would occur if the release of the employee did not also release the employer from vicarious liability. *L.C. v. R.P.; Horejsi*. As a matter of law,

---

2. NDCC 32–12.1–04(4) was first enacted in 1977 by House Bill 1071. 1977 N.D. Laws Ch. 303 § 4. That bill resulted from an interim study by the Committee on Political Subdivisions of the North Dakota Legislative Council. There is no doubt the intent of the committee was to make public employees liable for their willful and wan-

ton acts. *See Report of the North Dakota Legislative Council*, Forty–Fifth Legislative Assembly, 1977, at 175 ("committee intends that public employees be held liable for their intentional or malicious acts to make them accountable to the public they serve.").

therefore, we conclude Twila's release of Gillette from liability also released Kidder County from vicarious liability for his acts.

## D.

[¶ 36] To summarize, we conclude, as between the claimant and the County, the County may be vicariously liable for the willful and wanton acts of the employee within the scope of employment, but the employee also remains liable for those acts. Since the County is liable to compensate the claimant for damages caused by the employee's wanton and willful acts, the County is entitled to indemnification from the employee. The claimant and the employee cannot agree to release the employee of that responsibility without also releasing the County from liability to the claimant. For these reasons, we affirm the summary judgment for the County on Twila's vicarious-liability claim.

## III

### Negligent Supervision

[¶ 37] Twila claims the County negligently supervised Gillette. While she conceded the County was entitled to summary judgment on her negligent hiring and retention claims since there was no evidence of Gillette's prior misconduct, Twila argues the County knew she was a sexually promiscuous child, but failed to take any measure to reasonably protect her from exploitation while in foster care. She argues the County had a duty to protect wards in its foster care from being sexually abused by its employees and, because she was known to be sexually active when placed in the County's custody, the County should have foreseen the potential of sexual abuse. Twila contends the County failed in its duty when it let Gillette conduct private sessions with her during his counseling work.

[¶ 38] Explaining that this claimant "has a much more pessimistic view of human nature than does the Court," the trial court saw no evidence that the County should have known of possible misconduct by Gillette before January 17, 1992. Then, after her foster care had ended, Gillette's supervisor, Abbott, received relevant information and cautioned

Gillette about being alone with Twila, and also investigated allegations about Gillette's abuse. The trial court reasoned these facts demonstrated the County satisfactorily supervised Gillette.

[¶ 39] Apart from imputing liability for an employee's conduct, an employer can be directly liable for the employer's own acts in negligently supervising an employee. Restatement (Second) of Agency, § 213 (1957). It is "negligent supervision" when the employer fails " 'to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to other employees or third persons.' " *M.L. v. Magnuson*, 531 N.W.2d 849, 858 (Minn.Ct.App. 1995) (quoting *Cook v. Greyhound Lines, Inc.*, 847 F.Supp. 725, 732 (D.Minn.1994)). *Compare McLean v. Kirby Co.*, 490 N.W.2d 229, 235 (N.D.1992)(jury could reasonably infer foreseeability of physical harm from rape of potential customer in her apartment by door-to-door salesman-employee without proper precautions for customer safety).

[¶ 40] To recover for negligence, a claimant must establish a duty, a breach of that duty, causation, and damages. *See Ponticas v. K.M.S. Inv.*, 331 N.W.2d 907, 912–13 (Minn.1983). The duty extends to those injuries that are foreseeable.

[¶ 41] The shape of the duty of an employer to control conduct of an employee is well stated in Restatement (Second) of Torts § 317 (1965):

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

In this case, we conclude there is record evidence that, if believed, would justify a jury in finding Gillette used his office, his vehicle, and his working hours for sexual trysts with Twila while engaged in official business, that the County was capable of supervising Gillette's contacts with Twila, and the County should have known of the need and opportunity for exercising control to protect Twila.

[¶ 42] The legal custodian of a juvenile in North Dakota has a non-delegable "duty to provide for the ... protection ... and the physical ... welfare of the child...." NDCC 27–20–38. Experience tells us the potential for sexual abuse of a child is widely known and foreseeable. News stories and advance sheets are legion with accounts of sexual abuse of children. This record raises factual issues on whether the County should have done more to supervise Gillette to protect Twila while he was alone with her for counseling.

[¶ 43] Mental health professionals, such as social workers engaged in counseling and case management of juveniles, are acutely aware of "transference," a well-known psychological phenomenon that makes the potential of sexual exploitation foreseeable. Effective counseling relies upon transference, and it occurs in many, if not most, counselor-client relationships.

[¶ 44] This phenomenon was recently explained by the Wisconsin Court of Appeals:

This "transference" ... "is the emotional reaction which the patient in therapy has toward the therapist." It is a reaction that can leave the patient particularly vulnerable to the [therapist's] control [in such a manner that] "a sexual relationship between therapist and patient cannot be viewed separately from the therapeutic relationship that has developed between them." Further, "by introducing sexual activity into the relationship, the therapist runs the risk of causing additional psychological damage to the patient." Therefore, ... the [therapist] was acting "in the course of his professional services or professional responsibilities when he engaged in sexual activity with [his patient]."

*Steven G. by Robert G. v. Herget,* 178 Wis.2d 674, 505 N.W.2d 422, 426 (1993) (quoting *L.L. v. Medical Protective Co.,* 122 Wis.2d 455, 362 N.W.2d 174, 176–78 (1984)) (citations omitted).[3] The Wisconsin court identified therapy and counseling as involving more trust than in other professional relationships, thus leading to the transference phenomenon. *Id.* at 427. "[Transference] involves the emotional fragility for which treatment may have been sought, and permits the exploitation of the vulnerability that may be present during the course of treatment." All counseling relationships can be affected by the transference phenomenon.

[¶ 45] A number of cases have concluded that sexual contact between a counselor and a patient is foreseeable when the professional does not properly handle the transference phenomenon. *E.g., St. Paul Fire & Marine Ins. Co. v. Mitchell,* 164 Ga.App. 215, 296 S.E.2d 126 (1982); *St. Paul Fire & Marine Ins. Co. v. Love,* 459 N.W.2d 698 (Minn.1990);

---

**3.** *Simmons v. United States,* 805 F.2d 1363, 1364–65 (9th Cir.1986), elaborates:

Transference is the term used by psychiatrists and psychologists to denote a patient's emotional reaction to a therapist and is "generally applied to the projection of feelings, thoughts and wishes onto the analyst, who has come to represent *some person from the patient's past.*" *Stedman's Medical Dictionary* 1473 (5th Lawyers' Ed.1982). Transference "is perhaps regarded as the most significant concept in psychoanalytical therapy, and one of the most important discoveries of Freud."
... The proper therapeutic response is countertransference, a reaction which avoids emo-

tional involvement and assists the patient in overcoming problems.
When the therapist mishandles transference and becomes sexually involved with a patient, medical authorities are nearly unanimous in considering such conduct to be malpractice. *L.L.,* 362 N.W.2d at 176–77 (citing Davidson, *Psychiatry's Problem with No Name: Therapist-Patient Sex,* 37 Am.J.Psychoanalysis 43, 48–49 (1977))("[I]t is generally agreed that therapist-patient sex is psychologically deleterious for the involved woman patient and is unethical practice for the male practitioner.").…
(some citations omitted).

*Zipkin v. Freeman,* 436 S.W.2d 753 (Mo. 1968); *Simmons v. United States,* 805 F.2d 1363, 1371 (9th Cir.1986); *Aetna Life and Cas. Co. v. McCabe,* 556 F.Supp. 1342 (E.D.Pa.1983). The Minnesota Supreme Court has recognized the "wellknown hazard" of sexual relations between a psychologist and a patient that makes it, therefore, to a certain degree, a foreseeable risk of employment. *Marston v. Minneapolis Clinic of Psychiatry,* 329 N.W.2d 306, 311 (Minn.1982). When the known risk of improperly handling the occurrence of transference is coupled with the actual knowledge by the County of Twila's sexually promiscuous history, we believe a jury would be justified in deciding that Gillette's supervisor should have anticipated the potential and taken steps to protect Twila from exploitation by her counselor.

[¶ 46] Because of the known risk of sexual activity present in the unequal power relationship of counseling between a social worker and a child-ward, the potential of sexual contact between a male counselor and a female child-client raises questions of fact. *Compare Love,* 459 N.W.2d at 700 n. 1 (commenting that most cases of sexual involvement by a therapist are between a male therapist and a female patient).

[¶ 47] There are other parallels in the precedents for foreseeability of the potential of harm in a case like this. *See Champagne v. United States,* 513 N.W.2d 75 (N.D.1994)(hospital's duty to properly safeguard suicidal teen-ager in its custody); *First Trust Co. v. Scheels Hardware,* 429 N.W.2d 5, 8–9 (N.D.1988)(misuse of gun sold to child by gun-dealer was foreseeable risk). *See also Niece v. Elmview Group Home,* 131 Wash.2d 39, 929 P.2d 420 (1997)(sexual assault of resident of group home for developmentally disabled person by an employee was legally foreseeable); *M.L. v. Magnuson,* 531 N.W.2d at 853 (Syllabus by the Court: "The claim of negligent supervision of employment requires evidence of the lack of ordinary care in preventing foreseeable misconduct.").

[¶ 48] We conclude the evidence of knowledge by the County about its child-ward's history of sexual promiscuity created disputed issues of fact on Twila's negligent-supervision claim. Therefore, we reverse the summary judgment dismissing the negligent-supervision claim and remand for trial.

[¶ 49] MARING and NEUMANN, JJ., concur.

[¶ 50] VANDE WALLE, Chief Justice, concurring in part and dissenting in part.

[¶ 51] I join in parts I and II of the majority opinion. I dissent to part III of the majority opinion.

[¶ 52] In reversing the trial court's summary judgment on the claim of negligent supervision, the majority relies on the "phenomenon" of "transference." If the phenomenon does apply to a therapist, there is doubt in my mind whether or not social workers are "therapists" in the same sense as used by the authorities cited in the majority opinion. We have, for example, refused under Rule 503, N.D.R.Ev., to recognize a social worker as a therapist so that disclosure of an incestuous relationship to a social worker, who was not a physician or a psychologist, was not a privileged communication. *State v. Copeland,* 448 N.W.2d 611 (N.D.1989). Although a social worker is defined as a therapist under section 12.1–20–06.1, N.D.C.C., for purposes of the statute making sexual exploitation a crime if the social worker "purports to perform psychotherapy," a psychotherapist is defined by Rule 503(a)(3) of the N.D.R.Ev. as:

"(i) a person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be, while engaged in the diagnosis or treatment of a mental or emotional condition, including alcohol or drug addiction, or, (ii) a person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged."

I do not believe the record supports a finding that Gillette sought to treat Nelson for a "mental or emotional condition, including alcohol or drug addiction." Indeed, we have recognized that a social worker is often recognized as the antagonist rather than the therapist by those placed in the social workers caseload. *E.g., In Interest of J.K.S.,* 356 N.W.2d 88, 93 (N.D.1984) (VandeWalle, J., concurring specially).

[¶ 53] I agree the County has a duty to prevent the sexual abuse of its wards, but the duty is held to those injuries which are foreseeable. I cannot agree with Nelson's claim that a duty is established merely because the County knew she was sexually promiscuous. Only the most cynical view could justify a conclusion that knowledge on the part of the County of Nelson's history should, without more, cause the County to foresee its employees would naturally take advantage of the situation.

[¶ 54] Had the County in any way been alerted that Gillette, as an individual, might take advantage of Nelson, I would agree with the majority. But, there is, as Nelson concedes, nothing in this record to demonstrate the County should have foreseen Gillette would sexually abuse Nelson as a result of her sexual promiscuity. Unfortunately, the majority opinion reinforces a stereotype that men will succumb to a young woman's wiles, teaching that hereafter men are not to be totally trusted with young women. The conclusion to be drawn from the majority opinion is that Nelson can prove her case based on her known promiscuity and the fact Gillette was a male. That conclusion is at best a disservice, if not an indication of gender bias, to the many male social workers who would not have acted as did Gillette.

[¶ 55] I would affirm the entire judgment of the trial court.

[¶ 56] Gerald W. Vande Walle, C.J.

SANDSTROM, Justice, concurring and dissenting.

[¶ 57] Vince Gillette was the only social worker for Kidder County. Twila Nelson alleges Gillette engaged in sexual activities with her while she was a minor. Gillette is now the Director of Social Services for Sioux County. No criminal charges have ever been filed against Gillette. Gillette has consistently denied Nelson's allegations. Although he found problems with the testimony of both Gillette and Nelson, a hearing officer for the Board of Social Worker Examiners decided it more likely Nelson was telling the truth than Gillette, although the hearing officer said some events claimed by Nelson clearly did

not occur and probably had been suggested by her mother.

[¶ 58] Without admitting misconduct, Gillette has been dropped from the case in exchange for a "confession of judgment," which under the terms of the stipulation Gillette cannot be required to personally pay.

[¶ 59] Gillette, who lives in Bismarck with his wife and family, acknowledges he gave Nelson occasional rides to Bismarck to visit her mother. He denies any impropriety. There have never been any other allegations of misconduct by Gillette. The majority upholds dismissal of all but the negligent supervision claim against the county.

[¶ 60] After resolving the disputed evidentiary facts in favor of Nelson, what did Gillette's supervisor know and when did she know it?

[¶ 61] Prior to the last act of alleged abuse, the supervisor knew Nelson was a moderately retarded, promiscuous female teenager, and she knew Gillette is a male and he occasionally gave Nelson rides to Bismarck so Nelson could visit her mother. That's it. From that the majority says the supervisor should have been on notice and should have taken steps to prevent Gillette's alleged sexual exploitation of Nelson.

[¶ 62] The majority waxes on the "well-known psychological phenomenon" of "transference." But from the cases the majority cites, it appears to be a "well-known phenomenon" only as it relates to psychotherapists, and it is undisputed Gillette was not a psychotherapist.

[¶ 63] Although only one of its cited cases appears to actually support the proposition, the majority contends at ¶ 45: "A number of cases have concluded that sexual contact between a counselor and a patient is foreseeable when the professional does not properly handle the transference phenomenon." The cases *do* support the proposition "mishandling of transference [is] malpractice or gross negligence." *Simmons v. United States,* 805 F.2d 1363, 1365 (9th Cir.1986) (citing cases). None of the cases cited by the majority hold malpractice or gross negligence are inherently foreseeable.

[¶ 64] Only one "transference case" cited by the majority, *Simmons,* relates to a counselor who was a social worker. Perhaps the majority does not discuss the case in detail because the analysis undercuts its negligent supervision argument.

"Jerrie Simmons, a member of the Chehalis Tribe, sought mental health consultation from the Indian Health Service and was counseled by Ted Kammers, a social worker.

\* \* \* \* \* \*

"In October 1978 Mr. Kammers initiated romantic contact with Ms. Simmons during a counseling session, encouraging her to act on her professed feelings of attraction to him. In January 1979 he had sexual intercourse with her during an out-of-town trip and this romantic and sexual relationship continued during the course of Ms. Simmons' treatment.

\* \* \* \* \* \*

"Mr. Kammers' supervisor, Victor Sansalone, was informed of the situation between the counselor and Ms. Simmons in January 1980. Since the counseling relationship continued until July 1981, the district court found Mr. Sansalone was negligent in failing to do anything to prevent further harm to Ms. Simmons. Under the Fourth Circuit decision in *Andrews* [*v. United States,* 732 F.2d 366 (4th Cir.1984)] Government liability is predicated on such supervisory negligence. 732 F.2d at 371. In *Andrews* the supervising physician knew of certain 'sexual improprieties' before intercourse occurred. The Government here argues the *Andrews* defendant's negligence lay in not preventing harm which had not yet occurred, thus attempting to distinguish the instant case, wherein intercourse had occurred before Mr. Sansalone was aware of the situation. This distinction is unhelpful in that the district court found Ms. Simmons to have suffered psychological damage from the whole course of Mr. Kammers' conduct, *at least a portion of which should have been averted by Mr. Sansalone's intervention.*"

*Simmons* at 1364, 1371 (emphasis added). Unlike in *Simmons,* the supervisor in this case learned of the situation only *after* all the alleged sexual abuse occurred.

[¶ 65] The evidentiary facts most favorable to Nelson do not defeat summary judgment on the negligent supervision claim. This Court explained in *D.E.M. v. Allickson,* 555 N.W.2d 596, 603 (N.D.1996):

"In [*P.L. v.*] *Aubert* [, 545 N.W.2d 666 (Minn.1996) ], the Minnesota Supreme Court held that a school district could not be held liable for negligent supervision of a teacher who engaged in sexual contact with a student when it could not have anticipated the behavior or otherwise discovered it through the exercise of reasonable care."

[¶ 66] This Court then explained foreseeability:

"In addition, even if *Aubert* had some bearing upon this case it is clearly distinguishable. The underlying basis for the court's holding in *Aubert* was that the school district *had absolutely no indication that misconduct was occurring* between the teacher and student, and therefore the *injury was wholly unforeseeable. The court rejected the plaintiff's theory that sexual contact between teachers and students was a well-known hazard and impliedly foreseeable.*

"In this case, the Church was aware of possible misconduct. *Rumors had spread among Church members about possible sexual activity between Pastor Allickson and Donna Martin, and a Church employee confronted them about it.* When they denied their relationship, no further action or investigation occurred. *This is not a case where the plaintiffs rely upon implied foreseeability of sexual misconduct between pastors and parishioners.* Rather, the Martins claim the Church was on notice of possible misconduct and did not adequately investigate and respond."

*D.E.M.* at 603 n. 4 (emphasis added). Here, the County was not on notice. As in *Aubert* and *D.E.M.,* sexual contact between social workers and clients is not "a well-known hazard and impliedly foreseeable" any more than it is between teachers and students, and pastors and parishioners; and the County "had absolutely no indication that misconduct

was occurring" between Gillette and Nelson, and therefore any "injury was wholly unforeseeable."

[¶ 67] I would affirm the judgment of the district court.

[¶ 68] Dale V. Sandstrom.