McEvers, Justice.
 

 *446
 
 [¶ 1] The parents of nine minor children, individually and as guardians of the children, appeal from a district court judgment determining the statutory damage cap for tort claims against a political subdivision is constitutional. The parents argue the damage cap violates the open court, jury trial, equal protection, and special law provisions of the state constitution. We conclude the damage cap does not violate those constitutional provisions, and we affirm the judgment.
 

 I
 

 [¶ 2] The Larimore Public School District serves a rural area in northeast North Dakota with an enrollment of about 400 children and a total population base of 2,571 people. According to Superintendent Roger Abbe, the School District provides required core curriculum and special education services, elective courses, and extra-curricular activities for its students and ranks in the top twenty percent in the State for property tax mill levies. According to Abbe, the School District's anticipated revenues for the 2015-2016 and 2016-2017
 
 *447
 
 school years ranged between five million five hundred thousand dollars and five million six hundred thousand dollars and the School District's expenses for those years exceeded its revenues, requiring use of interim funds to pay the excess expenses.
 

 [¶ 3] In January 2015, a collision occurred between a School District bus and a BNSF Railway train. At the time, there were thirteen School District students riding home from school on the bus. One child died as a result of injuries sustained in the accident and the other children suffered serious injuries. The accident resulted in the potential for multiple damage claims in excess of the School District's aggregate statutory cap on liability under the codification of N.D.C.C. § 32-12.1-03(2) in effect at the time of the accident, which limited the liability of political subdivisions "to a total of two hundred fifty thousand dollars per person and five hundred thousand dollars for injury to three or more persons during any single occurrence regardless of the number of political subdivisions, or employees of such political subdivisions, which are involved in that occurrence."
 
 See
 
 2015 N.D. Sess. Laws ch. 242, § 1 (amending statute to increase the limit of liability for political subdivisions to a total of two hundred fifty thousand dollars per person and one million dollars for any number of claims arising from any single occurrence).
 

 [¶ 4] The School District and its government self-insurance pool, the North Dakota Insurance Reserve Fund, brought this interpleader action and deposited five hundred thousand dollars with the district court to satisfy the damage cap for claims arising from the accident under the applicable language of N.D.C.C. § 32-12.1-03(2). The parents and guardians for some of the children answered and counterclaimed, asserting the damage cap was unconstitutional. The parties stipulated to certain facts for purposes of a motion for summary judgment on the constitutional claims, including that at the time of the accident, the bus driver was a School District employee acting within the scope of his employment, that the bus driver's negligence was the sole proximate cause of the accident and the injuries, and that the total damages from the accident would exceed three million dollars. The parties also stipulated that the Insurance Reserve Fund provided the School District with a memorandum of coverage authorizing additional liability coverage in the amount of two million dollars for any one accident or loss "in the event of a judicial determination that the statutory limit of liability is not applicable to a specific occurrence."
 

 [¶ 5] The district court ruled the damage cap did not violate the open court, jury trial, equal protection, or special law provisions of the North Dakota Constitution. The court confirmed the five hundred thousand dollar deposit and discharged the School District and the Insurance Reserve Fund from any further liability for damages from the accident.
 

 II
 

 [¶ 6] The parents argue the damage cap for tort claims against political subdivisions in N.D.C.C. § 32-12.1-03(2) violates the open court, jury trial, equal protection, and special law provisions of the North Dakota Constitution.
 

 [¶ 7] In considering the parents' constitutional arguments, our inquiry is guided by several well-established rules:
 

 Whether a statute is unconstitutional is a question of law, which is fully reviewable on appeal. " 'All regularly enacted statutes carry a strong presumption of constitutionality, which is conclusive unless the party challenging the statute clearly demonstrates that
 
 *448
 
 it contravenes the state or federal constitution.' " " 'The justice, wisdom, necessity, utility and expediency of legislation are questions for legislative, and not for judicial determination.' " This Court exercises the power to declare legislation unconstitutional with great restraint. Under N.D. Const. art. VI, § 4, this Court "shall not declare a legislative enactment unconstitutional unless at least four of the members of the court so decide."
 

 Teigen v. State
 
 ,
 
 2008 ND 88
 
 , ¶ 7,
 
 749 N.W.2d 505
 
 (citations omitted).
 

 [¶ 8] In assessing the parents' constitutional arguments, we also recognize other courts have generally held that statutory damage caps for tort claims against governmental entities do not violate similar constitutional provisions.
 
 See
 
 James L. Isham, Annot.,
 
 Validity and Construction of Statute or Ordinance Limiting the Kinds or Amount of Actual Damages Recoverable in Tort Action Against Governmental Unit
 
 ,
 
 43 A.L.R. 4th 19
 
 , § 2 (1986).
 

 III
 

 [¶ 9] Before addressing the parties' specific arguments, we describe the historical background for governmental immunity in North Dakota. In
 
 Kitto v. Minot Park Dist.
 
 ,
 
 224 N.W.2d 795
 
 , 797 (N.D. 1974), this Court judicially abolished the doctrine of governmental immunity from tort liability and held governmental bodies, other than the state government, were subject to suit for damages by individuals injured by the negligent or wrongful acts or omissions of their agents and employees. This Court traced the historical origin of governmental immunity from England and said the generally recognized source of the doctrine was
 
 Russell v. Men of Devon
 
 , 2 T.R. 667, 100 Eng. Rep. 359 (1788), an English decision refusing recovery against an unincorporated county.
 
 Kitto
 
 , at 798. We said that in
 
 Russell
 
 there was not an established legal entity to bring the action against and it was brought against the "citizenry."
 

 Id.
 

 We explained the English court was "fearful of an 'infinity of actions' and concerned with the absence of a fund out of which to pay any judgment," and gave priority to the government over the individual.
 

 Id.
 

 We discussed the development of governmental immunity in the United States and said a Massachusetts court relied on
 
 Russell
 
 and held an incorporated county was immune from liability for the tortious acts of its employees.
 
 Kitto
 
 , at 798 (citing
 
 Mower v. The Inhabitants of Leicester
 
 ,
 
 9 Mass. 247
 
 (1812) ). We said that although political subdivisions now had corporate powers, funds, taxing authority, and substantial obligations and activities,
 
 Mower
 
 became the common law of the various states with few exceptions.
 
 Kitto
 
 , at 798.
 

 [¶ 10] This Court then discussed the development of governmental immunity and liability in the Dakota Territory and in North Dakota, stating two early cases upheld damage claims against municipal corporations for lack of reasonable care in maintaining streets and highways, and a subsequent case denied liability for a claim against a quasi-municipal corporation for injuries allegedly caused by the failure to maintain a bridge.
 
 Kitto
 
 ,
 
 224 N.W.2d at
 
 798-99 (citing
 
 Larson v. City of Grand Forks
 
 ,
 
 3 Dak. 307
 
 , 313-14,
 
 19 N.W. 414
 
 , 415-16 (1884) (affirming personal injury verdict against municipal corporation for negligent failure to keep streets in safe condition where legislature conferred power on municipal corporation to keep sidewalks clear and free from all obstructions);
 
 Ludlow v. City of Fargo
 
 ,
 
 3 N.D. 485
 
 , 489-92,
 
 57 N.W. 506
 
 , 507-09 (1893) (holding municipal corporation organized under state law liable for damages for personal injury sustained as result of municipality's maintenance of obstruction in street; stating that where corporate authority has
 
 *449
 
 duty and means to keep streets in repair, the corporation is liable without express statute declaring liability);
 
 Vail v. Town of Amenia
 
 ,
 
 4 N.D. 239
 
 , 243-50,
 
 59 N.W. 1092
 
 , 1093-96 (1894) (holding quasi-municipal corporation was not liable in tort for personal injuries allegedly caused by failure to repair and maintain highways and bridges) ). In
 
 Kitto
 
 , at 799 (quoting
 
 Vail
 
 ,
 
 4 N.D. at 245
 
 ,
 
 59 N.W. at
 
 1094 ), we discussed the distinction between incorporated and unincorporated governmental entities:
 

 It may be true, and we think is true, that the case of Russell v. Men of Devon, 2 Term R. 667, so often cited as the source of the doctrine of nonliability of quasi municipal corporations for injuries resulting from defective bridges or highways, never was intended to be authoritative further than that the inhabitants of a certain territory designated as a county, but not incorporated, and having no corporate purse, could not be held liable for such injuries, and that the case is not an authority for nonliability of counties in this country, where counties are incorporated and have a corporate purse.
 

 The
 
 Kitto
 
 court explained the
 
 Vail
 
 decision nevertheless recognized townships in North Dakota were then in the process of settlement and said a substantial judgment against a sparsely populated town or township could cause financial distress and slow development.
 
 Kitto
 
 , at 799. We said the
 
 Vail
 
 court held the Town of Amenia was not liable for damages under circumstances where it was appropriate for the individual to suffer rather than the public.
 

 Id.
 

 [¶ 11] In
 
 Kitto
 
 ,
 
 224 N.W.2d at 799-801
 
 , our analysis thereafter recognized the doctrine of governmental immunity in North Dakota had judicial origins, had been judicially modified on some occasions, and was not constitutionally mandated under language now found in N.D. Const. art. I, § 9. Our decision overruled prior decisions supporting the doctrine of governmental immunity and judicially abrogated that doctrine, but recognized the legislature could modify or shape governmental liability within its constitutional authority.
 
 Kitto
 
 , at 797, 803. We applied our decision judicially abrogating governmental immunity to the parties to that action and to causes of action arising fifteen days after adjournment of the Forty-Fourth Legislative Assembly, stating:
 

 There are two principal objects to be sought by prospective application of this decision. One object is to allow those governmental bodies which have relied upon our previous decisions adequate time to arrange liability insurance coverage for their acts or omissions. The second object is to allow the legislature opportunity to adopt such legislation as it deems advisable to mitigate any hardships arising from this decision.
 

 Id.
 

 at 804
 
 .
 

 [¶ 12] After
 
 Kitto
 
 , the Forty-Fourth Legislative Assembly enacted legislation addressing tort liability for political subdivisions and initially limited a political subdivision's liability to twenty thousand dollars per person and one hundred thousand dollars for any single occurrence, effective through June 30, 1977.
 
 See
 
 1975 N.D. Sess. Laws ch. 295, §§ 2, 13, 15. After an interim study and report by the Legislative Council, the Forty-Fifth Legislative Assembly enacted legislation limiting liability of political subdivisions to two hundred and fifty thousand dollars per person and five hundred thousand dollars for injury to three or more persons during any single occurrence. 1977 N.D. Sess. Laws ch. 303, § 3. Those limits were amended in 2015, after the accident in this case, to increase the liability to two hundred fifty thousand
 
 *450
 
 dollars per person and one million dollars per occurrence. 2015 N.D. Sess. Laws ch. 242, § 1.
 

 [¶ 13] Within that framework for governmental immunity and liability, we consider the parties' specific arguments about the applicable damage cap in N.D.C.C. § 32-12.1-03(2).
 

 IV
 

 [¶ 14] The parents argue the district court erred in concluding the damage cap for tort claims against political subdivisions did not violate the open court and remedy provisions of N.D. Const. art. I, § 9, which provides:
 

 All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay. Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct.
 

 [¶ 15] In deciding the damage cap did not violate N.D. Const. art. I, § 9, the district court recognized that constitutional language had never been construed as an absolute right and must be construed in light of the public's superior right and the necessities of the occasion. The court explained the constitutional language was not intended to ensure perfect justice or a complete remedy and concluded:
 

 the legislature, within the limits of its reason, has given a construction to the constitution which permits the enactment of statutes providing immunities and limitations in recognition of the superior rights of the public, and the necessities of the occasion. This Court cannot say, beyond reasonable doubt, that the legislature has created with Section 32-12.1-03, NDCC, a statute which violates the constitution. The superior rights of the public to have fully functioning local governments, unburdened by the fear or fact of unlimited tort liability outweighs the right of any individual to a guaranteed right of complete recovery.
 

 The further argument that the statutory cap on damages is insufficient to protect injured parties is an invitation for this Court to supplant its judgment for that of the legislature. The Court declines that invitation.
 

 The legislature has the power to place limits on access to courts, and to create immunities without violating Article I, Section 9. The legislature has done so with some alacrity, and in many areas. The provisions of Section 32-12.1-03, NDCC, which caps liability for political subdivisions does not violate the North Dakota Constitution.
 

 [¶ 16] The parents argue the damage cap for political subdivisions does not permit meaningful redress or access to the courts. They recognize the open court and remedy provisions are not absolute, but argue the district court erred in interpreting the constitutional language to limit access to courts in light of the superior rights of the public and the necessities of the occasion. They argue the open court and remedy provisions command that courts "shall" be open and every person "shall" have a remedy for any injury and the provisions protect against laws that completely foreclose injured plaintiffs' causes of action or otherwise limit their ability to receive a meaningful remedy. They argue the open court and remedy provisions preclude the legislature from artificially and arbitrarily limiting damages for actions cognizable at common law without leaving some adequate remedy. They claim the aggregate damage cap is wholly inadequate and diminishes proportionally with the number of people injured and the
 
 *451
 
 severity of their injuries. Citing language from
 
 Nelson v.Gillette
 
 ,
 
 1997 ND 205
 
 , ¶ 12,
 
 571 N.W.2d 332
 
 , they claim political subdivisions are subject to liability for negligence on the same basis as a private citizen is subject to liability.
 

 [¶ 17] The School District responds political subdivisions provide essential and mandated governmental services and are not like private citizens. The School District argues the right of access to the courts is not absolute and asserts the parents have not established the damage cap violates the open court and remedy provisions because the damage cap does not absolutely bar recovery.
 

 [¶ 18] To the extent the parents argue liability against political subdivisions is the same as liability against a private citizen under
 
 Nelson
 
 ,
 
 1997 ND 205
 
 , ¶ 12,
 
 571 N.W.2d 332
 
 , their argument reads language from that decision out of context. In
 
 Nelson
 
 , at ¶¶ 10-12, this Court discussed a county's vicarious liability for an employee's actions and said "[i]n a general way, [ N.D.C.C. § 32-12.1-03 ] makes the liability of political subdivisions the same as the liability of private citizens." That language from
 
 Nelson
 
 is couched in general terms and does not mean liability for political subdivisions is the same as liability for private citizens in all instances. Unlike private persons, political subdivisions are mandated to provide certain governmental services, and the public has an interest in the availability of those services within the limits of the political subdivision's financial resources.
 

 [¶ 19] This Court's decision in
 
 Kitto
 
 ,
 
 224 N.W.2d at 797, 803-04
 
 , explicitly overruled prior decisions supporting the doctrine of governmental immunity from tort liability and judicially abolished that doctrine, but recognized the legislature could modify or shape governmental liability within its constitutional authority to mitigate hardships arising from the decision.
 
 See also
 

 Bulman v. Hulstrand Constr. Co., Inc.
 
 ,
 
 521 N.W.2d 632
 
 , 633, 640 (N.D. 1994) (holding N.D. Const. art. I, § 9 did not bestow exclusive authority on legislature to waive or modify the State's sovereign immunity from tort liability and prospectively abrogating sovereign immunity to allow the legislature to implement a plan in advance to regulate lawsuits). Consistent with this Court's decisions in
 
 Kitto
 
 and
 
 Bulman
 
 , we have consistently recognized that N.D. Const. art. I, § 9 guarantees an important substantive right of access to courts for redress of wrongs, but is not absolute and does not guarantee a remedy for every claimed wrong.
 
 See
 

 Bouchard v. Johnson
 
 ,
 
 555 N.W.2d 81
 
 , 89 (N.D. 1996) ;
 
 Federal Land Bank v. Ziebarth
 
 ,
 
 520 N.W.2d 51
 
 , 56 (N.D. 1994) ;
 
 Farm Credit Bank v. Brakke
 
 ,
 
 483 N.W.2d 167
 
 , 172-73 (N.D. 1992) ;
 
 Andrews v. O'Hearn
 
 ,
 
 387 N.W.2d 716
 
 , 723 (N.D. 1986).
 

 [¶ 20] In
 
 Bouchard
 
 ,
 
 555 N.W.2d at 83-86, 89
 
 , a plaintiff claimed statutory provisions immunizing a ski facility operator from liability for inherent risks of skiing violated N.D. Const. art. I, § 9. We construed the statutory provisions and said the ski facility operator's compliance with a statutory list of noninclusive duties did not insulate the operator from liability for negligence caused by unnecessary hazards that could be eliminated by the use of ordinary care.
 
 Bouchard
 
 , at 83-86. We explained those unnecessary hazards were not, in the ordinary sense of the word, an "inherent risk" of skiing and were not immunized from liability under the statutory scheme.
 

 Id.
 

 We recognized the statutes, as we construed them, absolved a ski facility operator from liability in some instances, but were not an absolute bar to access to the courts within the meaning of N.D. Const. art. I, § 9.
 
 Bouchard
 
 , at 89.
 

 *452
 
 [¶ 21] In
 
 Andrews
 
 ,
 
 387 N.W.2d at 723
 
 , we discussed N.D. Const. art. I, § 9 in the context of a district court's refusal to consider juror affidavits to impeach a jury's verdict and the plaintiffs' argument the constitutional provision guaranteed a judicial remedy to civil litigants. We said the constitutional provision had repeatedly been construed as a guarantee of access to our State system of justice, but had never been construed as an absolute right and must be interpreted in light of the superior rights of the public and the necessities of the occasion:
 

 The non-absolute character of Section 9 is readily apparent by a review of this court's decisions interpreting that section as not requiring a remedy for every alleged wrong. And, although this court has, on occasion, used this provision of the North Dakota Constitution to correct a substantive error, we do not believe that Section 9 was intended to promote this court to the position of a super-legislature in charge of ensuring perfect justice and complete remedies, thereby supplanting the traditional function of the jury, the standards employed to evaluate a jury decision, and the rules of evidence, such as Rule 606(b), [N.D.R.Ev.,] that protect jury independence by preventing judicial overseeing of the internal workings of the jury. Although there may be occasions where this State constitutional provision is properly employed to protect a litigant against a deprivation of due process, to avert a harsh result that is otherwise inevitable, or to prevent the destruction of the only opportunity for an appropriate remedy, we do not believe that such a situation exists here.
 

 Andrews
 
 , at 723 (footnotes omitted).
 

 [¶ 22] Other courts have said statutory damage caps for claims against political subdivisions do not violate similar open court and remedy provisions.
 
 See
 

 State v. DeFoor
 
 ,
 
 824 P.2d 783
 
 , 790-91 (Colo. 1992) (holding access to court provision assures litigants courts shall be open to every person and does not address adequacy of remedy; statutory damage limit on claim against state does not violate access to court);
 
 Ryszkiewicz v. City of New Britain
 
 ,
 
 193 Conn. 589
 
 ,
 
 479 A.2d 793
 
 , 799 (1984) (stating open court provision cannot be construed as granting unqualified right to recover unlimited damages from governmental entities);
 
 Cauley v. City of Jacksonville
 
 ,
 
 403 So.2d 379
 
 , 384-86 (Fla. 1981) (stating there was no right to recovery for municipality negligence predating adoption of Florida constitution and rejecting claims that subsequent statutory damage cap on claims against municipality violated constitutional open court provision because statute relates to permissible legislative objective and is neither discriminatory, arbitrary, nor oppressive in application);
 
 Espina v. Jackson
 
 ,
 
 442 Md. 311
 
 ,
 
 112 A.3d 442
 
 , 456-63 (Md. Ct. App. 2015) (applying reasonableness test to damage limitation for claims against governmental entity; concluding damage cap did not leave plaintiff totally remediless or with a drastically inadequate remedy and holding limitation did not violate state constitutional provision for access to court and right to remedy);
 
 Wells v. Panola Cty. Bd. of Educ.
 
 ,
 
 645 So.2d 883
 
 , 890-92 (Miss. 1994) (stating open court provision did not create unlimited right of access to courts and holding damage cap for claim against School Board did not violate open court provision);
 
 Estate of Cargill v. City of Rochester
 
 ,
 
 119 N.H. 661
 
 ,
 
 406 A.2d 704
 
 , 705-06 (1979) (stating open court provision does not guarantee injured persons will receive full compensation for injuries and statute limiting tort recovery from governmental subdivisions does not violate that provision);
 

 *453
 

 Zauflik v. Pennsbury Sch. Dist.
 
 ,
 
 629 Pa. 1
 
 ,
 
 104 A.3d 1096
 
 , 1127-29 (2014) (stating open court provision is not without limitations and legislature acted within authority in adopting damage cap for actions against local governmental entities);
 
 Tindley v. Salt Lake City Sch. Dist.
 
 ,
 
 2005 UT 30
 
 , ¶¶ 12-26,
 
 116 P.3d 295
 
 (stating open court provision is not absolute guarantee of all substantive rights and damage cap on claims against governmental entity did not violate open court provision);
 
 Stanhope v. Brown Cty.
 
 ,
 
 90 Wis.2d 823
 
 ,
 
 280 N.W.2d 711
 
 , 720 (1979) (holding limit on recovery from governmental tortfeasor does not violate remedy provision of state constitution).
 
 See also
 
 Annot.,
 
 43 A.L.R.4th 19
 
 , at § 5.
 

 [¶ 23] Our decisions construing and applying N.D. Const. art. I, § 9 establish that provision is not an absolute right and does not guarantee a complete remedy for every claimed wrong. In assessing claims under that constitutional provision, our decisions do not preclude courts from considering public interests and the circumstances of the occasion and may consider whether any remedies provided by statute are wholly inadequate. It is for the legislature to provide for available remedies, including any limitations on the type or amount of a party's remedies. The damage cap for tort claims against political subdivisions is not an absolute bar to a money damages remedy. Nor does it set a limit so arbitrarily low as to be the functional equivalent of an absolute bar. Therefore, it does not violate N.D. Const. art. I, § 9.
 

 V
 

 [¶ 24] The parents argue the damage cap for claims against political subdivisions invades the province of the jury in violation of the language in N.D. Const. art. I, § 13, that "[t]he right of trial by jury shall be secured to all, and remain inviolate."
 

 [¶ 25] The district court said the jury trial provision does not create an absolute right to have a jury determine damages in all cases and merely preserves the right to a trial by jury as it existed at the time the state constitution was adopted. The court recognized that parties have a right to a jury trial in a negligence action and said that N.D.C.C. § 32-12.1-03(2) does not prohibit the right to a jury trial or prohibit a jury from returning a verdict for all damages suffered by all claimants. Rather, the court explained the statute limits the amount that legally may be recovered from a political subdivision:
 

 Likewise, Section 32-12.1-03, NDCC, affects only the amount of damages that an injured party may ultimately recover. It does not limit the right of the party from presenting the case fully to the jury. Section 32-12.1-03, NDCC, is an issue of economic implication only.
 

 There is no constitutional right to a full recovery on a jury's verdict. The legislature has not deprived the defendant of any right to trial by jury through the placement of the statutory cap on damages, and exempting political subdivisions from liability for amounts beyond that.
 

 [¶ 26] The parents argue the constitutional right to jury trial is "inviolate" and has been preserved as it existed when the constitution was adopted and in all cases in which it was a right at common law. They claim that under
 
 Larson
 
 ,
 
 3 Dak. 307
 
 ,
 
 19 N.W. 414
 
 , and
 
 Ludlow
 
 ,
 
 3 N.D. 485
 
 ,
 
 57 N.W. 506
 
 , a jury was authorized to determine damages in negligence actions against political subdivisions when the language of N.D. Const. art I, § 13, was initially adopted and the subsequent enactment of a damage cap in N.D.C.C. § 32-12.1-03(2) takes that right away from a jury.
 

 *454
 
 [¶ 27] This Court has recognized N.D. Const. art. I, § 13 preserves a trial by jury as it existed when the constitution was adopted.
 
 Riemers v. Eslinger
 
 ,
 
 2010 ND 76
 
 , ¶ 26,
 
 781 N.W.2d 632
 
 ;
 
 State v. Brown
 
 ,
 
 2009 ND 150
 
 , ¶ 45,
 
 771 N.W.2d 267
 
 ;
 
 Peters-Riemers v. Riemers
 
 ,
 
 2002 ND 72
 
 , ¶ 5,
 
 644 N.W.2d 197
 
 ;
 
 Gen. Elec. Credit Corp. v. Richman
 
 ,
 
 338 N.W.2d 814
 
 , 817 (N.D. 1983).
 

 [¶ 28] As our previous discussion of
 
 Kitto
 
 recognized, early cases from the Supreme Court of the Dakota Territory and this Court turned on the status of the defendant as either an incorporated municipality or an unincorporated quasi-municipality in the context of claims about a duty to maintain streets, highways, and bridges.
 
 Kitto
 
 ,
 
 224 N.W.2d at
 
 798-99 (citing
 
 Larson
 
 ,
 
 3 Dak. 307
 
 ,
 
 19 N.W. 414
 
 ;
 
 Ludlow
 
 ,
 
 3 N.D. 485
 
 ,
 
 57 N.W. 506
 
 ; and
 
 Vail
 
 ,
 
 4 N.D. 239
 
 ,
 
 59 N.W. 1092
 
 ). Those cases, when read with our decision in
 
 Kitto
 
 explicitly overruling prior decisions supporting governmental immunity, do not unequivocally establish that all governmental subdivisions, including school districts, could be held liable for tort damages when the language in N.D. Const. art. I, § 13 was adopted. See
 
 Kitto
 
 , at 799 (discussing
 
 Vail
 
 and noting that quasi-municipal corporations, such as counties, townships, towns, and school districts were not liable in tort). However, our decision in this case does not hinge on the viability of tort claims against school districts when the language of N.D. Const. art. I, § 13 was adopted, because we conclude the damage cap does not deprive a tort claimant of a jury trial in an action against a political subdivision.
 

 [¶ 29] In
 
 Arneson v. Olson
 
 ,
 
 270 N.W.2d 125
 
 , 137 (N.D. 1978), this Court concluded a statutory procedure requiring some medical malpractice claimants to have their claim tried without a jury in certain circumstances violated the claimants' constitutional right to a jury trial. In
 
 Odden v. O'Keefe
 
 ,
 
 450 N.W.2d 707
 
 , 710 (N.D. 1990), we held an eighteen-month blanket moratorium on civil jury trials for budgetary purposes was a significant period of time and violated a civil litigant's state constitutional right to a civil jury trial. In contrast, the damage cap at issue in this case does not preclude a jury from determining facts, including whether and to what extent a claimant was injured; rather, the damage cap limits the scope of recovery from a political subdivision.
 

 [¶ 30] Other courts have generally held that statutory caps on damages in actions against political subdivisions do not violate the right to a jury trial.
 
 See
 

 Cauley
 
 ,
 
 403 So.2d at
 
 384-87 ;
 
 Horton v. Or. Health & Sci. Univ.
 
 ,
 
 359 Or. 168
 
 ,
 
 376 P.3d 998
 
 , 1043-44 (2016) ;
 
 Zauflik
 
 ,
 
 104 A.3d at
 
 1130-33 ;
 
 Wright v. Colleton Cty. Sch. Dist.
 
 ,
 
 301 S.C. 282
 
 ,
 
 391 S.E.2d 564
 
 , 569-70 (1990).
 

 [¶ 31] In
 
 Zauflik
 
 ,
 
 104 A.3d at 1132-33
 
 , the Pennsylvania Supreme Court explained that a statutory cap on damages recoverable from a governmental entity did not violate Pennsylvania's jury trial provision:
 

 The damages cap does not present a condition or restriction on appellant's right to have a jury hear her case; rather, the burden lies in the limited amount of recovery allowed, and that is obviously not the same thing. Successful plaintiffs are often limited in their ability to recover the full amount of a jury's award for many different reasons-a defendant may simply be judgment-proof, for example-but this practical reality has nothing to do with the plaintiff's right to seek to have the merits of her cause determined by a jury, rather than some other
 
 process
 
 .
 

 ....
 

 Even if it is assumed that the right to a jury trial in negligence cases filed
 
 *455
 
 against governmental entities existed in the "heretofore" described in Article I, Section 6, such that it must "remain inviolate" now, the full-blown jury trial appellant demanded and received was not impeded by the damages cap. What was affected was the ultimate recovery post-verdict, which was not a function of the trial here being by jury. As stated, that effect of the cap exists in all such cases-whether resolved by judgment motion, jury trial, bench trial, or negotiated settlement-but the cap did not alter the availability, or contours of, a jury trial, any more than a jury trial against a judgment-proof defendant could be said to impair the jury trial
 
 right
 
 .
 

 [¶ 32] The rationale of
 
 Zauflik
 
 ,
 
 104 A.3d at
 
 1132-33 is consistent with our decisions in
 
 Arneson
 
 ,
 
 270 N.W.2d at 137
 
 , that a process requiring certain tort claims be tried without a jury violates the right to a jury trial and in
 
 Odden
 
 ,
 
 450 N.W.2d at 710
 
 , that an eighteen-month blanket moratorium on civil jury trials for budgetary purposes violates the right to a jury trial. We conclude the damage cap in N.D.C.C. § 32-12.1-03(2) does not preclude a jury from determining damages; rather, the damage cap limits the amount of recovery ultimately allowed against a political subdivision. We conclude the damage cap in N.D.C.C. § 32-12.1-03(2) does not violate the jury trial provisions of N.D. Const. art. I, § 13.
 

 VI
 

 [¶ 33] The parents argue the damage cap treats similarly situated persons differently, both facially and as applied, and violates the state equal protection provisions of N.D. Const. art. I, § 21, which provides:
 

 No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens.
 

 [¶ 34] The state equal protection clause does not prohibit legislative classifications or require identical treatment of different groups of people.
 
 State v. Leppert
 
 ,
 
 2003 ND 15
 
 , ¶ 7,
 
 656 N.W.2d 718
 
 . Rather, the equal protection clause prohibits the government from treating individuals differently who are alike in all relevant aspects.
 
 Hamich, Inc. v. State ex rel. Clayburgh
 
 ,
 
 1997 ND 110
 
 , ¶ 31,
 
 564 N.W.2d 640
 
 . Legislative classifications are subject to different levels of judicial scrutiny, and the level applied depends on the right infringed by the challenged classification.
 
 Leppert
 
 , at ¶ 7. We have applied three levels of judicial scrutiny to equal protection claims:
 

 We apply strict scrutiny to an inherently suspect classification or infringement of a fundamental right and strike down the challenged statutory classification "unless it is shown that the statute promotes a compelling governmental interest and that the distinctions drawn by the law are necessary to further its purpose." When an "important substantive right" is involved, we apply an intermediate standard of review which requires a " 'close correspondence between statutory classification and legislative goals.' " When no suspect class, fundamental right, or important substantive right is involved, we apply a rational basis standard and sustain the legislative classification unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose.
 

 Gange v. Clerk of Burleigh Cty. Dist. Court
 
 ,
 
 429 N.W.2d 429
 
 , 433 (N.D. 1988) (citations omitted).
 

 [¶ 35] The district court recognized that the right to sue and recover for personal
 
 *456
 
 injuries is an important substantive right and analyzed the parents' equal protection claim under the intermediate level of scrutiny. The court said N.D.C.C. § 32-12.1-03 created a classification based on the difference between those injured by negligent acts of political subdivisions and those injured by other persons and evaluated that classification under the intermediate standard of review. The court explained that political subdivisions are required to provide public services within limited public finances and concluded:
 

 Unlike a landowner who can still close his lands to recreational users, or a ski resort operator who can close his business, a political subdivision has no other option. Political subdivisions are required to provide schools and educational opportunities to all children, police, fire, and emergency services, water, sewage, and trash disposal, street and road maintenance, and dozens of other public services. Political subdivisions are captives to the public's needs. After
 
 Kitto
 
 , they also became responsible to answer for any negligent acts in addition to providing vital public needs.
 

 The public fisc is not a bottomless resource. Political subdivisions have limited taxing authority. See, Chapter 57-15, NDCC. Every dollar siphoned away to pay for tort liability, or to purchase more insurance removes limited resources and tax revenues collected for the specific public function of the political subdivision. The legislature certainly must have had these issues in mind when it set out to mitigate the hardships created by the
 
 Kitto
 
 decision.
 

 The defendants argue that a more reasonable solution to the problem faced by the legislature would have been additional insurance regulations. Inasmuch as no insurance company would be obligated to provide insurance coverage, it is hard to see how this regulation would have succeeded. Further, even if this is a valid option, the legislature chose not to follow it. Instead, the legislature limited liability. The Court does not second-guess the legislature's choice between two viable options.
 

 The legislative purpose here was to limit the liability of political subdivisions so that affordable insurance would be available, and political subdivisions would still be able to provide vital public services within the limits of their taxing authority. Finally, the statute does not preclude all liability. Rather it limits that liability. The Court therefore concludes that Section 32-12.1-03, NDCC, bears a close relationship to legislative intent.
 

 [¶ 36] The parents argue the damage cap does not satisfy strict scrutiny, and alternatively argue it does not satisfy the intermediate level of scrutiny. They contend the damage cap violates equal protection because it: (1) provides full compensation to the modestly injured while limiting compensation to the catastrophically injured; (2) treats injured persons differently based on the identity of the tortfeasor as a political subdivision or as a nongovernmental tortfeasor; and (3) treats multiple injured parties differently than one injured person. Finally, they assert the aggregate damage cap of five hundred thousand dollars per occurrence is unconstitutional as applied to this case with multiple seriously injured victims.
 

 [¶ 37] We initially reject the parents' argument that strict scrutiny applies to these classifications. On several occasions, this Court has recognized the right to recover for personal injuries is an important substantive right subject to the intermediate standard of equal protection analysis.
 

 *457
 

 Olson v. Bismarck Parks & Recreation Dist.
 
 ,
 
 2002 ND 61
 
 , ¶ 11,
 
 642 N.W.2d 864
 
 ;
 
 Bouchard
 
 ,
 
 555 N.W.2d at
 
 87 ;
 
 Bellemare v. Gateway Builders, Inc.
 
 ,
 
 420 N.W.2d 733
 
 , 736 (N.D. 1988) ;
 
 Hanson v. Williams Cty.
 
 ,
 
 389 N.W.2d 319
 
 , 325 (N.D. 1986) ;
 
 Patch v. Sebelius
 
 ,
 
 320 N.W.2d 511
 
 , 513 (N.D. 1982) ;
 
 Herman v. Magnuson
 
 ,
 
 277 N.W.2d 445
 
 , 450-52 (N.D. 1979) ;
 
 Arneson
 
 ,
 
 270 N.W.2d at 132-33
 
 . We adhere to those decisions. We conclude the intermediate level of scrutiny applies to our analysis of the damage cap in N.D.C.C. § 32-12.1-03(2) and requires a close correspondence between the statutory classification and legislative goals. That test approximates the substantive-due process test that historically has been used by this Court and also governs substantive-due process claims.
 
 See
 

 Arneson
 
 , at 132-33.
 

 [¶ 38] We also reject the parents' facial challenge to the damage cap. A facial challenge to a statute requires the challenger to establish that no set of circumstances exists under which the statute would be valid.
 
 See
 

 U.S. v. Salerno
 
 ,
 
 481 U.S. 739
 
 , 745,
 
 107 S.Ct. 2095
 
 ,
 
 95 L.Ed.2d 697
 
 (1987). The language of N.D.C.C. § 32-12.1-03(2) provides full recovery for individuals with claims under two hundred and fifty thousand dollars and for certain aggregate claims less than five hundred thousand dollars. On its face, the damage cap does not treat individuals having claims below these amounts differently depending on whether the claim is against a governmental or nongovernmental entity. We conclude the parents have not established there are no set of circumstances under which the damage cap would be valid, and we reject their facial challenge to N.D.C.C. § 32-12.1-03(2).
 

 [¶ 39] A facially valid statute, however, may violate equal protection in its application or effect.
 
 Olson
 
 ,
 
 2002 ND 61
 
 , ¶ 10,
 
 642 N.W.2d 864
 
 . In
 
 Olson
 
 , at ¶ 14, we considered an equal protection challenge to a statute treating nonpaying recreational users of another's land differently than paying users of another's land. We explained the recreational use immunity statute was intended to provide limited tort immunity to landowners to encourage them to provide access to their land without charge for public recreational use.
 

 Id.
 

 We said the encouragement of recreational use of property was an important legislative goal and concluded the recreational use immunity statute advanced that goal in a manner that closely corresponded to the achievement of that goal.
 
 Id.
 
 at ¶¶ 14-17.
 

 [¶ 40] In
 
 Bouchard
 
 ,
 
 555 N.W.2d at 86-88
 
 , we considered an equal protection challenge to a statute granting ski area operators immunity for damages resulting from an inherent risk of skiing. We said the challenged classification differentiated between ski area operators and other potentially liable parties.
 

 Id.
 

 We construed the statute to limit recovery without totally precluding liability and held the statute had a close correspondence to a legitimate legislative purpose of limiting ski area operator's liability from some of the inherent risks associated with skiing.
 

 Id.
 

 at 88
 
 .
 

 [¶ 41] In
 
 Herman
 
 ,
 
 277 N.W.2d at 450-54
 
 , we considered an equal protection challenge to a statute requiring the timely filing of claims against a municipality as a condition precedent to instituting a tort action against the municipality. We held the governmental interest of fostering prompt investigation of claims against governmental entities to allow fiscal planning established a close correspondence between the statutory classification and the legitimate legislative goal of fiscal planning for governmental entities.
 

 Id.
 

 at 453-54
 
 .
 

 [¶ 42] In
 
 Arneson
 
 ,
 
 270 N.W.2d at 126
 
 (quoting 1977 N.D. Sess. Laws, ch. 251), we considered multiple constitutional challenges to a medical negligence recovery act "to limit professional liability of qualifying healthcare providers to patients
 
 *458
 
 electing to be bound, to create a trust fund for the benefit of patients suffering damage caused by negligence of the healthcare provider, and to establish a commission on medical competency." We concluded parts of the act violated several constitutional provisions, including a provision authorizing this Court to promulgate procedural rules and provisions guaranteeing due process, equal protection, and the right to a jury trial.
 

 Id.
 

 at 131-38
 
 . We held a statutory damage cap of three hundred thousand dollars for medical malpractice cases violated equal protection under the intermediate level of scrutiny.
 

 Id.
 

 at 135-36
 
 . We said the legislative goals for the statute included the availability of competent medical and hospital services at reasonable costs, the elimination of the expenses involved in nonmeritorious malpractice claims, the allowance of adequate compensation for patients with meritorious claims, and the encouragement of physicians to practice medicine in North Dakota.
 

 Id.
 

 at 127
 
 . We concluded there was not a sufficiently close correspondence between those goals and the statutory classification treating seriously injured victims of medical negligence differently than other victims of medical negligence.
 

 Id.
 

 at 135-36
 
 . We explained:
 

 When we examine the legislative purpose of the Act, we find that the incidence of malpractice claims in North Dakota is far lower than the average in the United States. The Legislature was advised that malpractice insurance rates were determined on a national basis, and did not take into account the state-wide experience of smaller States such as North Dakota. Thus premiums were unjustifiably high for States such as North Dakota with fewer claims and smaller settlements and judgments.
 

 The evidence in the case before us, however, indicates that either the Legislature was misinformed or subsequent events have changed the situation substantially. Evidence in the present case shows that one of the largest insurance companies is accepting applications for malpractice insurance in North Dakota, and using rates lower than the national averages.
 

 One comparison of rates given to the Legislature shows that premiums in North Dakota are the sixth lowest in the United States.
 

 Based upon these facts, and others of the same import, the trial court made a finding that there did not appear to be an availability or cost crisis in this State. We cannot say that this finding is clearly erroneous, based upon the evidence in this case.
 

 In the absence of such a finding of crisis, and in view of the drastic limitation on recovery, we conclude that the $300,000 limitation on recovery in malpractice cases is a violation of the equal-protection provision of the North Dakota Constitution, Section 20. It is likewise violative of the similar provision of the Fourteenth Amendment to the United States Constitution.
 

 Arneson
 
 , at 136.
 

 [¶ 43] In
 
 Arneson
 
 ,
 
 270 N.W.2d at 135-36
 
 , we held there was not a sufficiently close correspondence between the legislative objectives and the limitation on recovery in malpractice actions.
 
 Arneson
 
 , however, involved a statutory scheme limiting an injured party's recovery from a nongovernmental entity and did not involve a damage cap for claims against political subdivisions.
 
 See
 

 id.
 

 at 137-38
 
 (stating cumulative effect of act as a whole was arbitrary, unreasonable, and discriminatory with no reasonable relation to attainment of results desired).
 

 [¶ 44] This case involves a damage cap for claims against a political subdivision, which implicates considerations involving
 
 *459
 
 the financing of public services. Section 32-12.1-01, N.D.C.C., describes the legislative intent for the provisions limiting political subdivision liability:
 

 This chapter creates additional powers and optional and alternative methods for the single and specific purpose of enabling political subdivisions to pay and to compromise claims and judgments, to issue bonds to fund and satisfy the same, to levy taxes in amounts necessary for such purposes without respect to limitations otherwise existing, and to compromise judgments and make periodic payments on such compromised amount.
 

 See also
 
 1977 N.D. Sess. Laws ch. 303, § 1.
 

 [¶ 45] The legislative history for the damage cap reflects the availability and cost of insurance and the financial stability and ability of local governmental entities to pay damage claims were primary considerations for establishing the damage cap. Unlike private entities, political subdivisions are required to provide certain enumerated public services and there is a legitimate governmental goal for fiscal planning and continued financial viability of local governmental entities within their applicable taxing authority.
 
 See
 

 Herman
 
 ,
 
 277 N.W.2d at 453-54
 
 (recognizing fiscal planning for governmental subdivisions establishes close correspondence between statutory classification and legislative goals). Political subdivisions have limited taxing authority and the public fisc is not unlimited.
 
 See generally
 
 N.D.C.C. ch. 57-15. The statutory damage cap is part of a statutory framework that limits liability to an amount within affordable coverage for political subdivisions, relative to their limited taxing authority. The damage cap for the liability of a political subdivision advances that legitimate legislative goal.
 

 [¶ 46] In
 
 Zauflik
 
 ,
 
 104 A.3d at 1120-24
 
 , the Pennsylvania Supreme Court recognized the legitimate legislative goal of fiscal planning and continued financial viability involved with damage caps for claims against governmental entities under the intermediate level of scrutiny and upheld a similar monetary damage cap against an equal protection challenge. The Pennsylvania Supreme Court discussed the legislature's policy considerations for establishing a damage cap of five hundred thousand dollars for actions against political subdivisions in the context of a jury verdict against a school district for more than fourteen million dollars:
 

 [T]he proper question is whether the General Assembly could determine, faithfully with the Constitution, that [the liability cap] struck the appropriate balance. At heart, this is a question of policy addressed to the General Assembly itself, which has the greater capacity for broad analysis of such complex questions as the implications of self-insurance or risk-sharing pools, or the actual budgetary ability of school districts and other agencies to carry insurance under various scenarios of uncapped liability.
 

 ....
 

 More fundamentally, the argument begs the constitutional question: the assessment and balancing of alternative or conflicting policies to resolve the difficult and complex questions raised by a tragic situation such as appellant's are not particularly amenable to resolution by an appellate court with a limited, fact-specific record, in the context of a constitutional challenge. We have little difficulty seeing some facial merit in the interests ably identified from all quarters in this case. Appellant is not an organization or a lobbyist: she is an injured plaintiff, who suffered a catastrophic injury, who wants the tortfeasor to take responsibility and make her whole. This is a simply-stated
 
 *460
 
 but powerful position. On the other hand, local agencies and municipalities have very real concerns about their ability to preserve their financial stability so that they may continue to serve the public and provide critical services to their citizens, especially their poorest residents. That unpredictable and catastrophic losses can wreak financial havoc is another simply-stated but powerful argument.... [T]his constitutional challenge implicates core public policy questions, concerning both the propriety and the amount of a statutory damages cap, that the political branches are better positioned to weigh and balance.
 

 In any event, it is not difficult to imagine the adverse budgetary consequences for local agencies of even one multi-plaintiff lawsuit involving severe injuries ... if liability were uncapped....
 

 The prospect that a single large damages award in a negligence case filed against a public tortfeasor-such as a school district-could spell financial ruin for that public defendant is not a new one.... For the reasons we have explained, appellant's position is difficult to sustain because she essentially asks this Court to make uniquely legislative judgments, such as whether it is "better" to provide for unlimited governmental liability in tort to individual private parties, or is it "better" to limit such liability in order to avoid curtailing services on which the public as a whole depends for its health, safety and welfare. In such cases, the scale is "weighted on both sides with legitimate interests" and "this recognition should [end] the inquiry.".... While we have genuine sympathy for appellant's individual situation (and particularly in light of the fact that the amount of the cap has not been increased, or adjusted for inflation, in the thirty-six years since its adoption), we conclude that appellant has not shown that the
 
 classification
 
 created by the Section 8553 damages cap-distinguishing between plaintiffs suing public tortfeasors and those suing private defendants-clearly, palpably and plainly violates equal protection principles. The protection provided by the cap for local government entities is closely related to important and legitimate legislative objectives....
 

 Outside the constitutional context, to the extent genuine questions might be raised regarding the
 
 amount
 
 of the cap, we note that such questions require detailed study and analysis of all relevant policy factors in a complicated balancing act that is properly addressed to the General Assembly.
 

 Zauflik
 
 ,
 
 104 A.3d at 1120-23
 
 (footnotes omitted).
 

 [¶ 47] Here, the legislature enacted the damage cap for political subdivisions for the "specific purpose of enabling political subdivisions to pay and to compromise claims and judgments, to issue bonds to fund and satisfy the same, to levy taxes in amounts necessary for such purposes without respect to limitations otherwise existing, and to compromise judgments and make periodic payments on such compromised amount." N.D.C.C. § 32-12.1-01. Many political subdivisions in North Dakota, such as the School District in this case, encompass rural areas and have a limited tax base to raise funds for mandated services. For example, the School District has a population base of 2,571 people and an enrollment of about 400 children with yearly revenues of about five million five hundred thousand dollars and expenses exceeding revenues for the relevant years. We recognize the aggregate damage cap for claims against a political subdivision may not afford all claimants complete or perfect relief for multiple catastrophic
 
 *461
 
 claims from a single occurrence. While we sympathize with those who have suffered a catastrophic injury and loss, we agree with the Pennsylvania Supreme Court's rationale that the competing policy considerations involved with establishing damage caps for political subdivisions are legitimate considerations for the legislative branch. In our view, the establishment of the aggregate statutory damage cap at issue in this case represents a core legislative function with a sufficiently close correspondence to the legitimate legislative goals of providing affordable liability insurance for political subdivisions within applicable fiscal constraints.
 

 [¶ 48] The parents nevertheless claim the fiscal constraints are not as dire in this case because the Insurance Reserve Fund has provided the School District with a memorandum of coverage for two million dollars "in the event of a judicial determination that the statutory limit of liability is not applicable to a specific occurrence." According to the chief executive officer of the Insurance Reserve Fund, however, that coverage is for federal litigation that is not subject to the North Dakota's damage cap, for accidents in other states with damage caps higher than in North Dakota, and for the unlikely possibility the damage cap is declared unconstitutional. More importantly, the existence of the memorandum of coverage, by itself, does not eliminate the close correspondence between the statutory classification at issue in this case and legitimate legislative goals. Intermediate scrutiny requires a close correspondence between a statutory classification and legislative goals and does not require a perfect fit between means and ends. Under intermediate scrutiny, the legislature has some latitude in determining how precisely to fit means and ends.
 

 [¶ 49] We conclude there is a close correspondence between the damage cap at issue in this case and legitimate legislative goals to satisfy the intermediate level of scrutiny for the parents' equal protection claims under N.D. Const. art. I, § 21. We therefore conclude the applicable damage cap in N.D.C.C. § 32-12.1-03(2) does not on its face, or as applied, violate the equal protection provisions of N.D. Const. art. I, § 21.
 

 VII
 

 [¶ 50] The parents argue the damage cap violates the special law provisions of N.D. Const. art. IV, § 13, which provides, in part:
 

 The legislative assembly shall enact all laws necessary to carry into effect the provisions of this constitution. Except as otherwise provided in this constitution, no local or special laws may be enacted, nor may the legislative assembly indirectly enact special or local laws by the partial repeal of a general law but laws repealing local or special laws may be enacted.
 

 [¶ 51] The district court ruled the damage cap did not create a special law, concluding it:
 

 serves a legitimate government purpose of providing a safeguard against unlimited liability by a political subdivision. It thereby ensures availability of insurance at a cost within the subdivision's taxing authority. At the same time, the statute allows persons injured by the negligence of a political subdivision an avenue of relief, albeit limited. The limitation further falls equally on all political subdivisions, and all persons injured by political subdivisions.
 

 [¶ 52] A statute relating to persons or things as a class is a general law, one relating to particular persons or things of a class is a special law.
 
 MCI Telecomms. v. Heitkamp
 
 ,
 
 523 N.W.2d 548
 
 , 552 (N.D. 1994) A special law only applies to particular
 
 *462
 
 persons or things of a class, while a general law applies to all persons and things of a class.
 
 Best Products Co., Inc. v. Spaeth
 
 ,
 
 461 N.W.2d 91
 
 , 99 (N.D. 1990). If a statute operates to treat all persons or members of a class within the scope of the statute equally, the statute is general and not special.
 
 Bellemare
 
 ,
 
 420 N.W.2d at 739
 
 . A general law operates alike on all persons and property similarly situated.
 

 Id.
 

 [¶ 53] Here, the damage cap operates alike for all similarly situated persons and political subdivisions. The language of the damage cap is written in general terms to apply to all similarly situated political subdivisions and persons and treats them alike for purposes of the special law provisions of N.D. Const. art. IV, § 13. We conclude the language of the damage cap is written in general terms equally applicable to all political subdivisions and persons and does not violate the special law provisions of N.D. Const. art. IV, § 13.
 

 VIII
 

 [¶ 54] We affirm the district court judgment.
 

 [¶ 55] Lisa Fair McEvers
 

 Daniel J. Crothers
 

 Jerod E. Tufte
 

 Cynthia Feland, D.J.
 

 Gerald W. VandeWalle, C.J.
 

 [¶ 56] The Honorable Cynthia Feland, D.J., sitting in place of Jensen, J., disqualified.